# No. 13-55859 (Lead Appeal)

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

INGENUITY 13 LLC

         *Plaintiff-Appellant*

and

PAUL HANSMEIER, Esquire, *et al.*,

         *Movants-Appellants*,

    v.

JOHN DOE,

         *Defendant-Appellee*,

Consolidated With Appeal Nos.:
  13-55880; 13-55881; 13-55882;
  13-55883; 13-55884; 13-56028

Related Appeal No.:
  13-80114

---

## JOHN DOE'S ANSWERING BRIEF ON THE MERITS

---

Appeals From Order Awarding Sanctions And Order Setting Bond By
The United States District Court For The Central District Of California
Honorable Otis D. Wright, II, Case No. 2:12-cv-8333-ODW-JCx

---

Morgan E. Pietz (SBN 260629)
THE PIETZ LAW FIRM
3770 Highland Avenue, Suite 206
Manhattan Beach, CA 90266
Telephone:  (310) 424-5557
Facsimile:  (310) 546-5301
mpietz@pietzlawfirm.com

Nicholas R. Ranallo (SBN 275016)
LAW OFFICES OF NICHOLAS RANALLO
371 Dogwood Way
Boulder Creek, CA 95006
Telephone: (831) 703-4011
Facsimile:  (831) 533-5073
nick@ranallolawoffice.com

*Attorneys for Defendant-Appellee JOHN DOE*

## CORPORATE DISCLOSURE STATEMENT

The defendant appellee John Doe is an individual, therefore no corporate disclosure statement is required.  Fed. R. App. Proc. 26.1.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................2

TABLE OF CONTENTS.............................................................................3

TABLE OF AUTHORITIES ........................................................................6

I. STATEMENT OF JURISDICTION ........................................................10

II. STATEMENT OF ISSUES PRESENTED FOR REVIEW.................................11

III. STATEMENT OF THE CASE..............................................................12

    (a) Appellants' Skewed Treatment of the Record on Appeal ...........................13

    (b) Prenda Law, Inc.: Copyright Infringement Scourge of the Federal Courts...14

    (c) Prenda Did Not Dismiss The Cases Because The District Court Issued an
        Order Making It "Impossible" To Proceed; It Did So To Avoid Responding
        To Discovery Designed To Expose Its Web of Deceit.................................17

    (d) Before the Court Were Numerous Declarations and Documentary Exhibits
        Outlining a Pattern of Fraud, Forged Documents, Identity Theft,
        Disobedience of Court Orders, Straw Men and Offshore Shell Companies .23

    (e) The Court Held Two Evidentiary Hearings: At The First, Alan Cooper
        Testified Credibly That The Copyright Assignments Bearing His Name
        Were Forgeries, At the Second, Prenda Principals Pled The Fifth...............31

    (f) The Sanctions Order Awarded Monetary Sanctions To Doe, In The Form Of
        Attorneys' Fees Adjusted Upwards, And Referred The Prenda Principals For
        Criminal and Disciplinary Investigation .......................................35

    (g) Since Being Sanctioned, The Prenda Principals Have Continued To Litigate
        In Bad Faith ...............................................................36

    (h) Gibbs Submitted Financials With His Motion for Indicative Ruling That
        Support The District Court's Findings That Steele And Hansmeier Are
        Behind Prenda And The De Facto Real Parties In Interest ..........................41

IV. SUMMARY OF THE ARGUMENT .................................................44

V. ARGUMENT ..............................................................................................47

  (a) The Award of Full Attorney's Fees And Costs To John Doe Should Be Affirmed Because Compensatory Sanctions Are Properly Issued Under The Court's Inherent Authority And Prenda Richly Deserves It..........................47

    (1) Standard Of Review For Imposition Of Sanctions Pursuant to Court's Inherent Authority ....................................................................................47

    (2) It Is Well-Settled That A U.S. District Court May Impose Civil, Compensatory Sanctions Pursuant To Its Inherent Authority.................48

    (3) Here, The District Court Had Jurisdiction And Authority To Sanction All Of The Sanctioned Parties Including The Prenda Principals ..................51

      (A) The District Court Had Personal Jurisdiction Over Each Of The Sanctioned Parties ..........................................................................51

      (B) Helmac Deals With Extending The Court's Inherent Sanction Authority To Non-Lawyer, Non-Parties Over Whom The Court Lacks Personal Jurisdiction, Which Is Not The Issue Here ..............53

    (4) Given The Sanctioned Parties' Extreme Abuse Of The Judicial Process, And The Quasi-Public Interest Aspect To the Cases Below, It Was Not An Abuse Of Discretion To Award So-Called "Fees On Fees"..............56

    (5) The Fact That The Forged Documents Were Filed Only In The AF Holdings Cases Is A Red Herring Because Other Aspects Of The Sanctioned Parties' Fraud Occurred In The Lead Case Below ..............60

  (b) The "Punitive Multiplier" Part Of The Sanctions Award To John Doe Should Also Be Affirmed Because It Is Akin To Punitive Damages Or It Can Be Justified As A Lodestar Enhancement ...........................................................62

    (1) The Supreme Court Has Noted That Punitive Damages Advance Interests of Deterrence And Are Properly Awarded In Civil Cases Without Resort to Criminal Due Process Procedures ............................62

    (2) The Supreme Court Also Recognized The Need For A Civil Procedure To Deter Wrongful Civil Litigation Conduct By Enacting Rule 11(c)...63

    (3) Deterrence Was Also A Key Concern In *DeVille* and *Dyer* ..................64

      (A) DeVille: If Deterrent Penalty Fails As Matter Of Court's Inherent Authority, It Can Be Sustained Under Bankruptcy Version Of Rule 11(c), Absent Criminal Due Process Protections ..............................64

      (B) Dyer: There Is Potential Tension Between Rule For Punitive Damages And Rule For Contempt Penalties, And Court's Inherent Sanction Power Should Provide For Deterrence ...............................67

(4) Here, The Punitive Multiplier Should Be Sustained In Order To Appropriately Deter Appellants And Other Similarly Situated Copyright Litigants From Abusing The Federal Court System ................................69

(5) The Multiplier Should Also Be Affirmed, Or Remanded For Further Findings, On The Theory That It Was An Enhancement Of The Attorneys' Fees Lodestar, Which Does Not Require Criminal Due Process Protections....................................................................75

(6) If Remanded, The District Court Should Also Consider Imposition Of A Deterrent Sanction Per Rule 11(c), Additional Reasonable Fees And Costs, And Imposition Of A "Non-Serious" Penalty ..............................77

(c) Since Being Sanctioned, Prenda And Its Lawyers Have Continued To Litigate In Bad Faith, Thus Justifying The Court's Exercise Of Discretion In Requiring A Higher Bond And Imposing Various Conditions ....................79

(1) Standard Of Review For Amount And Conditions On Appellate Bonds Is Abuse Of Discretion....................................................................79

(2) In View Of Prenda's Continued Bad Faith Regarding The Bond Issue, The District Court Was Within Its Discretion To Impose The Conditions Requested By John Doe ........................................................79

VI. CONCLUSION .......................................................................81

STATEMENT OF RELATED CASES ....................................................83

CERTIFICATE OF COMPLIANCE........................................................84

CERTIFICATE OF SERVICE ..............................................................85

# TABLE OF AUTHORITIES

**Cases**

*AF Holdings v. Does 1-135*,
   N.D. Cal. Case No. 5:11-cv-0336-LHK, ECF No. 42, 2/23/12 ...........................16

*AF Holdings, LLC v. Navasca*,
   N.D. Cal. No. 3:12-cv-2396, ECF No. 116, 9/16/13.............................................42

*AT&T Broadband v. Tech Commc'ns, Inc.*,
   381 F.3d 1309 (11th Cir. 2004)...........................................................................61

*Azizian v. Federated Dep't Stores, Inc.*,
   499 F.3d 950 (9th Cir. 2007)........................................................................40, 80

*Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc.*,
   492 U.S. 257 (1989) ............................................................................................63

*Chambers v. Nasco, Inc.*,
   501 U.S. 32 (1991) ..............................................................................................48

*Commodity Futures Trading Comm'n. v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1112
   (9th Cir. 1999)....................................................................................................48

*Concrete Pile & Products of Calif., Inc. v. Construction Laborers Pension Trust for
   So. Calif.*, 508 U.S. 602 (1993). .........................................................................48

*Cooter & Gell v.Hartmarx Corp.*,
   496 U.S. 384 (1990) ............................................................................................64

*Cox v. Delaware, Inc.*,
   239 F.3d 910 (7th Cir.2001).................................................................................69

*Donaldson v. Clark*,
   819 F.2d 1551 (11th Cir. 1987)...........................................................................64

*Eisenberg v. Univ. of New Mexico*,
    936 F.2d 1131 (10th Cir. 1991)...........................................................................64

*Exxon Shipping Co. v. Baker*,
    554 U.S. 471 (U.S. 2008) ...................................................................63

*F.J. Hanshaw Enter. v. Emerald River Develop.*,
    244 F. 3d 1128 (9th Cir. 2001).................................................... passim

*Fadhl v. City and County of San Francisco*,
    859 F.2d 649 (9th Cir. 1988)...............................................................76

*Fink v. Gomez*,
    239 F.3d 989 (9th Cir. 2001)........................................................50, 69

*Frantz v. U.S. Powerlifting Fed'n*,
    836 F.2d 1063 (7th Cir. 1987)..............................................................66

*FTC v. Leshin*,
    719 F.3d 1227 (11th Cir. 2013).............................................................61

*Grine v. Chambers (In re: Grine)*,
    439 B.R. 461 (Bankr. N.D. Oh. 2010) ..................................................58

*Guam Soc'y of Obstetricians & Gynecologists v. Ada*,
    100 F.3d 691 (9th Cir. 1996)..........................................................47, 76

*Helmac Prods. Corp. v. Roth Corp.*,
    150 F.R.D. 563 (E.D. Mich. 1993),.......................................................52

*Hudson v. Moore Business Forms, Inc.*,
    898 F.2d 684 (9th Cir. 1990)................................................................64

*Hutto v. Finney*,
    437 U. S. 678 (1978). .........................................................................49

*Ingenuity 13, LLC v. John Doe*,
    2013 U.S. Dist. LEXIS 64564................................................................13

*Kleiner v. First National Bank of Atlanta*,
    751 F.2d 1193 (11th Cir.1985)..............................................................73

*Lindblade v. Knupfer* (*In re: Dyer*),
    322 F.3d 1178 (9th Cir. 2003)...................................................... passim

*Lockary v. Kayfetz*,

    974 F.2d 1166 (9th Cir. 1992),................................................................58

*Mackler Prods. v. Turtle Bay Apparel*,

    92-cv-5745, 1994 WL 267857 .............................................................64

*Mackler Prods., Inc. v. Cohen*,

    146 F.3d 126 (2d Cir. 1998)........................................................ passim

*Mark Indus., Sea Captain's Choice, Inc.*,

    50 F.3d 730 (9th Cir. 1995).................................................................79

*Miller v. Cardinale* (*In re: DeVille*),

    280 B.R. 483 (9th Cir. B.A.P. 2002)........................................... passim

*New Kids on the Block v. News America Pub., Inc.*,

    971 F.2d 302 (9th Cir. 1992 ................................................................49

*Orange Blossom Ltd. P'ship v. S. Cal. Sunbelt Developers, Inc. (In re S. Cal. Sunbelt*

    *Developers, Inc.)*, 608 F.3d 456 (9th Cir. 2010 ...............................58, 59

*Perez v. Z Frank Oldsmobile, Inc.*,

    223 F.3d 617 (7th Cir. 2000)..............................................................76

*Primus Auto Fin. Servs., Inc. v. Batarse*,

    115 F.3d 644 (9th Cir. 1997)..............................................................48

*Sekiya v. Gates*,

    508 F.3d 1198 (9th Cir. 2007).......................................................14, 56

*State Farm Mut. Auto. Ins. Co. v. Campbell*,

    538 U.S. 408 (2003) .......................................................................46, 63

*Toledo Scale Co. v. Computing Scale Co.*,

    261 U. S. 399 (1923) ...........................................................................57

*Union Mine Workers of Am. v. Bagwell*,

    512 U.S. 821 (1994) ...................................................................... passim

*United States v. Hernandez*,

    109 F.3d 1450.......................................................................................48

*Universal Oil Products Co. v. Root Refining Co.,*
   328 U. S. 575 (1946). ...............................................................................49

*Van Gerwen v. Guarantee Mut. Life,*
   214 F.3d 1041 (9th Cir. 2000),..............................................................77

**Statutes**

11 U.S.C. § 105(a) ...........................................................................68, 69

11 U.S.C. § 303(i)(2) ........................................................................58, 59

11 U.S.C. § 362............................................................................68, 69

28 U.S.C. § 1927...................................................................................50

**Rules**

Fed. R. App. P. 28(a)(8)(A); ................................................................14

Fed R. Civ. P. 11 .......................................................................... passim

Fed R. Civ. P. 41(a)(1)(A)(i) ..........................................................23, 74

Ninth Circuit Rule 28-2.2 ....................................................................11

**Law Reviews**

Polinsky, M. & Shavell, S., *Punitive Damages: An Economic Analysis,* 111 Harv. L.
   Rev. 869 (1998).................................................................................76

DeBriyn, J., "Shedding Light on Copyright Trolls: An Analysis of Mass Copyright
   Litigation in the Age of Statutory Damages" 19 UCLA Ent. L. Rev. 79 (2012)...15

Balganesh, Shyamkrishna, "The Uneasy Case Against Copyright Trolls," 86 S. Cal.
   L. Rev 723 (2013). .............................................................................15

# I.  STATEMENT OF JURISDICTION

**(a)** **Subject Matter Jurisdiction Of The District Court**

Per Circuit Rule 28-2.2, appellee John Doe agrees with appellants' statement.

**(b)** **Basis For Appellate Jurisdiction**

Per Circuit Rule 28-2.2, appellee John Doe agrees with appellants' statement.

**(c)** **Timeliness Of Notices of Appeal**

Per Circuit Rule 28-2.2, appellee John Doe agrees with appellants' statement.

## II.  STATEMENT OF ISSUES PRESENTED FOR REVIEW

(1)    Were the district court's factual findings, that a cohort of lawyers and their alter-ego offshore shell company "clients" and law firm engaged in "brazen misconduct and relentless fraud" in the cases below, clearly erroneous?

(2)    Was it an abuse of the district court's discretion to award compensatory attorneys' fees and costs to John Doe made payable jointly and severally by the lawyers behind the scheme, who objected to the court's jurisdiction over them, as well as by their law firm and purported "clients"?

(3)    In a case where deterrent sanctions were unavailable under Rule 11, was it an abuse of the district court's discretion to apply a "punitive multiplier" to the fees and costs awarded to John Doe, given appellants brazen abuse of the judicial system, and given that appellants were afforded notice and an opportunity to be heard, but not the full panoply of criminal due process protections?

(4)    If the district court did not have the power to adjust the fees awarded to John Doe upward as a punitive sanction under its inherent authority, should the double fees nevertheless be affirmed, or the case remanded for further findings, under a lodestar enhancement approach?

(5)    Was it an abuse of the district court's discretion to increase the amount of the bond on appeal to secure attorney's fees on appeal, and impose conditions, given the sanctioned parties' continuing bad faith on that issue?

### III.  STATEMENT OF THE CASE

These consolidated appeals arise from an order issuing monetary and other sanctions against various attorneys and entities related to Prenda Law, Inc. ("**Prenda**").  *Ingenuity 13, LLC v. John Doe*, 2013 U.S. Dist. LEXIS 64564 (C.D. Cal., May 6, 2013) (Case No. 12-cv-8333, ECF No. 130) (E.R. 19–29) (the "**Sanctions Order**").  The parties sanctioned by the district court were:

- Ingenuity 13 LLC (plaintiff shell company in lead/related cases below);

- AF Holdings LLC (plaintiff shell company in related cases below);

- Prenda Law, Inc. (Chicago law firm responsible for cases below);

- John Steele, Esq. (principal of Prenda, beneficial owner of plaintiffs);

- Paul Hansmeier, Esq. (principal of Prenda, beneficial owner of plaintiffs);

- Paul Duffy, Esq. (principal of Prenda, beneficial owner of plaintiffs);

- Brett Gibbs, Esq. (mid-level operative "of counsel" to Prenda)[1].

*Id.* at E.R. 28:15–17.  Throughout this brief, Steele, Hansmeier and Duffy are the "**Prenda Principals**," and the Prenda Principals plus Ingenuity 13, LLC, AF Holdings, LLC, and Prenda are the "**Sanctioned Parties**".

---

[1] Gibbs filed his own appeal (No. 13-55871), which was consolidated, *sua sponte*, with the instant appeals, by the motions panel in response to one of several emergency motions. No. 13-55859, Dkt. No. 7. Gibbs filed a motion for indicative ruling in the district court seeking to be released from the sanctions. After the district court indicated it would revise its ruling based on Gibbs' dissociation from Prenda, the Court of Appeals remanded for that purpose, and Gibbs' appeal was voluntarily dismissed with prejudice on November 18, 2013. No. 13-55871, Dkt. No. 16.

**(a)    Appellants' Skewed Treatment of the Record on Appeal**

The Sanctioned Parties' recitation of the factual record skips the beginning, omits or glosses over most of the key facts in the middle, and never quite arrives at the end of the proceedings below.  The facts appellants did include in their brief are technically accurate in most respects.  However, they ignore all of the documentary exhibits and accompanying declarations, not to mention all of the evidence and testimony adduced at the March 11, 2013, evidentiary hearing.  If the appellants' appeal were limited strictly to jurisdictional or procedural issues, perhaps they could get away with this.  But it is not, and they shouldn't. Appellants argue, repeatedly, that, "the record on appeal is devoid of any information from which the District Court could reasonably infer that the individual Appellants were real parties in interest."  Opening Br. p. 26.   Simply, this is not true.[2]  To the extent the appellants dispute the district court's factual alter-ego findings, but fail to cite to the relevant portions of the record, their appeal is frivolous, subject to dismissal, and independently sanctionable. *See* Fed. R. App. P. 28(a)(8)(A); *Sekiya v. Gates*, 508 F.3d 1198, 1200 (9th Cir. 2007).  Thus, it falls to Doe to explain the missing facts.

---

[2] *See, e.g.,* Supp. E.R. 730 (Steele's response to a Florida state bar investigation where his lawyer represented to the bar that "Mr. Steele is actually a client of Prenda. Steele maintains an ownership interest in several of Prenda's larger clients."); Supp. E.R. 744–45 (affidavit and email from Prenda's local counsel in a Georgia case where AF Holdings' lawyer admits to opposing counsel that John Steele "has an interest in AF [Holdings]"); Supp. E.R. 905–19 (financial records showing that Steele and Hansmeier kept almost 70% of Prenda's income).

**(b)     Prenda Law, Inc.: Copyright Infringement Scourge of the Federal Courts**

For the roughly two and a half years they were in the business, attorneys associated with Prenda, and its predecessor firm Steele Hansmeier, PLLC, filed at least 348 lawsuits, against over 16,000 John Doe defendants. Supp. E.R.[3] 130–31. The self-proclaimed pioneer of Prenda's "copyright troll"[4] business model, attorney John L. Steele, bragged to the media that in so doing, Prenda made "a few million dollars." Supp. E.R. 301, fn.5 *citing* Supp. E.R. 1114 (Forbes Article); *see also* Supp. E.R. 905–19 (financial records from Gibbs showing that of the approximately $1.9 million dollars in legal fee income Prenda brought in for 2012 attributable to "Pirates").

As the district court eventually put it so aptly, at the most fundamental level, Prenda has always been engaged in an attempt to "outmaneuver the legal system;" gamesmanship has been a constant theme for Prenda. E.R. 19:19 (Sanctions Order). Prenda tried many different theories, and told all kinds of different courts different things, many of which were both implicitly and explicitly misleading, all towards one goal: obtaining ISP subpoena returns which would identify large numbers of

[3] Throughout this brief, "E.R." refers to Appellants' original excerpts of records, and "Supp. E.R." refers to appellee John Doe's supplemental excerpts of record.

[4] See, generally, Balganesh, S., "The Uneasy Case Against Copyright Trolls," 86 S. CAL. L. REV 723 (2013); DeBriyn, J., "Shedding Light on Copyright Trolls: An Analysis of Mass Copyright Litigation in the Age of Statutory Damages" 19 UCLA ENT. L. REV. 79 (2012).

individuals.  These individuals could then be pressured into paying "settlements," upon threat of publicly naming (and shaming) them in pornography lawsuits. *See* Supp. E.R. 131–36 (Pietz Dec'l. re: Prenda Law, ¶¶ 21–28) (this declaration on Prenda's history is worth reviewing in its entirety). By using the federal courts' subpoena power and leveraging the threat of high statutory damages, Prenda apparently made a few million dollars in copyright infringement "settlements," despite never litigating a single matter through to a merits judgment.

In February of 2012, Judge Koh of the Northern District of California ordered Prenda to disclose, just how many of those 15,000+ John Does who Prenda was threatening with statutory damages had ever actually been served with a complaint? *AF Holdings v. Does 1-135*, N.D. Cal. Case No. 5:11-cv-0336-LHK, ECF No. 42, 2/23/12. The answer, as it turned out, was zero. Supp. E.R. 190–95 (Exhibit to Gibbs' status report).

In response to its 'emperor has no clothes' moment, Prenda doubled down. They stopped trying to join defendants en masse and began filing individual suits. *See* E.R. 35, 56, 74, 92, 113.  They also posted on the Prenda website, wefightpiracy.org, the names of people they were publicly naming and serving as defendants, as a warning to other John Does they were targeting. Supp. E.R. 155, 163–70.

Throughout 2010 and 2011, Steele Hansmeier, PLLC and then Prenda had

filed most of their cases on behalf of actual, known pornography producers. Presumably concerned with opening their actual clients and themselves up to prevailing defendant attorneys' fees given the dubious basis for their cases, in 2012 they started filing suits on behalf of mysterious offshore shell companies. In particular, they began filing copyright infringement cases in federal court on behalf of AF Holdings, LLC ("**AF Holdings**") and Ingenuity 13, LLC ("**Ingenuity 13**"), both organized under the laws of the island of Nevis in the Caribbean, as alleged by Prenda in the complaints.  *See, e.g.,* E.R. 36, E.R. 57.

Further to this new strategy, in the spring and summer of 2012, Brett Gibbs as "of Counsel" for Prenda, on behalf of AF Holdings and Ingenuity 13, filed at least 45 cases in the Central District of California.  Supp. E.R. 119.  Each case was against a single John Doe defendant, identified only by an I.P. address, and each was essentially a cookie-cutter copy of the others, alleging the same claims for infringement and negligence.  *See* E.R. 35, 56, 74, 92, 113.

/ /

**(c)    Prenda Did Not Dismiss The Cases Because The District Court Issued an Order Making It "Impossible" To Proceed; It Did So To Avoid Responding To Discovery Designed To Expose Its Web of Deceit**

Appellants misleadingly argue that Prenda simply filed their complaint on October 8, 2012, obtained leave to issue ISP subpoenas, and then, inexplicably, Judge Wright rescinded early discovery orders after taking over per low-number transfer. Opening Brief p. 11.  Actually, it was Magistrate Judge Walsh who first put a stop to Prenda's discovery in the lead case below, by an order staying the subpoena return date. Order on Ex Parte for Stay, ECF[5] No 16.

More importantly, appellants' narrative ignores the filing of several key documents by John Doe, which first raised the alarm below regarding Prenda's apparent misconduct. Notice of Related Cases (ECF No. 15) (12/3/12)[6]; Supp. E.R. 7–105 (Putative John Doe's *Ex Parte* Application for Leave to Take Early Discovery and For a Further Stay of the Subpoena Return Date and supporting exhibits) (12/18/12).

---

[5] Any district court document not included in the excerpts or supplemental excerpts of record that is cited by "ECF No." refers to the lead case below, No. 12-cv-8333, unless otherwise indicated.

[6] Prenda responded to the notice of related cases with a motion to sanction defense counsel Pietz for filing it.  Motion for Sanctions, ECF No. 22, 12/17/12.  Among other only slightly more coherent theories, Prenda claimed that filing *a notice of related cases* in each case (as required by local rule) was "multiplicative," and that Pietz should therefore be sanctioned per 28 U.S.C. § 1927, for multiplying proceedings.  *Id.* That motion, which would not be the last attempt to sanction defense counsel Pietz, was summarily denied, prior to the filing of an opposition. ECF No. 31, 12/26/12.

This filing and its supporting documentary exhibits detailed startling revelations regarding one Alan Cooper of Minnesota.  *Id.*  Cooper had previously been a caretaker for John Steele at Steele's family property in rural Minnesota.  *Id.* Cooper had become concerned that Steele and/or Prenda had stolen his identity and, without his knowledge or consent, set him up as a straw man owner/officer of their various "clients".  *Id.*

Cooper, through his attorney Paul Godfread,[7] initially reached out to Prenda regarding his concerns.  *Id.* Prenda's responses were not reassuring, and Mr. Cooper eventually brought his concerns to the attention to the U.S. District Court in Minnesota.  Supp. E.R. 38–39 (Godfread's Letter); Supp. E.R. 63 (Affidavit of Alan Cooper). As Cooper's attorney explained to the court in Minnesota, and Doe explained to the court below, the name "Alan Cooper" had been signed (with a "/s/") as the "Manager" of Ingenuity 13, LLC, on a verified petition to perpetuate testimony in a Prenda case in the Northern District of California.  Supp. E.R 61. "Alan Cooper" had also been signed (in cursive) "on behalf of" the assignee AF

---

[7] In typical 'Damn the Torpedoes' fashion, Prenda, John Steele, and Paul Duffy would all eventually sue attorney Godfread personally, on ridiculous defamation claims, in three different actions, in different jurisdictions, in apparent retaliation for his representation of Mr. Cooper.  *See Duffy v. Godfread*, N.D. Ill. No. 1:13-cv-1569, ECF No. 34, 9/9/13 (motion for sanctions against Prenda Law, Inc. and Paul Duffy) *see also* Supp. E.R. 682 (Steele's voicemail to Cooper stating "I know you've been served with a third lawsuit.  And there are more coming.  Don't worry about that").

Holdings, LLC, on the copyright assignments attached as Exhibit B to each of the AF Holdings' complaints in the Central District of California cases at issue here. Supp. E.R. 104. Despite inquiries from defense counsel here and from Godread, Prenda's strategy was to steadfastly avoid answering any questions about "Alan Cooper." Supp. E.R. 38–39 (Godfread's letter)*; Supp. E.R. 94–97 (email exchange between counsel in lead case below where Gibbs—or someone using his email account—dodges questions about Alan Cooper).

Doe also noted to the district court that the jurisdiction where Prenda's "clients," Ingenuity 13, LLC and AF Holdings, LLC were purportedly organized, the island of Nevis in the Caribbean, was not only a tax haven, but also a notorious corporate *privacy* haven. Supp. E.R. 27. Even if the government of Nevis was predisposed to complying with U.S. subpoenas regarding the ownership of a Nevis entity (which is doubtful), it would be unable to do so, because Nevis does not know. *See id.*

In addition, Doe submitted part of a very telling transcript from a Prenda hearing in the Middle District of Florida, before Judge Scriven. Supp. E.R. 70–92. The transcript memorialized Steele and/or Prenda's attempt to hold out their former paralegal[8], Mark Lutz, as a "client representative" at a federal court hearing, even

---

[8] Although Paul Hansmeier was reluctant to admit the fact in his deposition, Lutz was identified by Prenda numerous times as a paralegal. Supp. E.R. 730 (Steele's

though Lutz was not an officer or director, had no power to bind, and knew nothing about the company. *Id.* Judge Scriven had ordered that a principal of the plaintiff, Sunlust Pictures, LLC and a principal of Prenda Law, Inc. be present at the hearing; neither organization sent a principal (other than Lutz), and she viewed the whole episode as an attempted fraud on the court. *Id.* Tellingly though, John Steele *was* present at the hearing. Supp. E.R. 80–81. He started out in the gallery, but when the Judge saw Lutz constantly trying to confer with him, she asked Steele who he was. *Id*. He responded that he was "not an attorney with any law firm right now,[9] but I have worked with Mr. Duffy in the past and I am certainly familiar with this litigation just because I've been involved in many different cases like this in the past." *Id* at 81. Steele then proceeded to answer questions about the client, Sunlust Pictures. *Id.*

Taken together: (i) the Alan Cooper situation and Prenda's refusal to talk about it; (ii) the fact that the plaintiff entities were formed in Nevis, a notorious

---

response to a Florida state bar investigation stating that "The Prenda law firm is composed of. . . and Paralegal Mark Lutz.")

[9] This was a lie typical of Steele's M.O. of trying to run things from behind the scenes. Both shortly before and after that date, Steele continued to identify himself as "of Counsel" to Prenda Law Inc. *Compare* Supp. E.R. 180; *with* Supp. E.R. 81 *and* Supp. E.R. 320, ¶ 15. Similarly, when being investigated by the Florida Bar for unlicensed practice of law, Steele averred in December of 2012 that he was a resident of Nevada. Supp. E.R. 1077, ¶ 2 (Exhibit 12). Three months later, when fighting jurisdiction of the California courts over his person in the case here, he signed an affidavit stating that he resided in the state of Florida. ECF No. 75-3, ¶ 3.

privacy haven, and (iii) Prenda holding out Steele's former paralegal to the Florida court as a "client representative," all seemed to suggest that perhaps Steele was really behind these shell company "clients," because there was a pattern where every time an individual at one of these "clients" had to be identified, the name or person utilized turned out to be closely linked to John Steele. *See* Supp. E.R. 26.

While Doe's *ex parte* application outlining the facts above was under submission, all of the cases were transferred to Judge Wright, pursuant to the low-number rule.   After vacating the orders authorizing the ISP subpoenas, Judge Wright then granted Doe's *ex parte* application to take limited early discovery on the issues surrounding "Alan Cooper" and the copyright assignments. Supp. E.R. 106-07.  Doe duly propounded the specific requested discovery.  *See*  Supp. E.R 141, ¶ 42.  Prenda responded to the granting of Doe's *ex parte* application by filing a motion to disqualify Judge Wright. ECF No. 35.  In response to the disqualification motion, Doe filed an opposition (Supp. E.R., 108-23) describing the recent history of this kind of litigation in the Central District (*id.*) supported by an extensive declaration detailing the history of Prenda Law, Inc. (Supp. E.R. 124–42), and documentary Exhibits A through O  (Supp. E.R. 143–295).  The disqualification motion was denied by Judge Fitzgerald.  E.R. p. 149.

Prenda argues that the order vacating the ISP subpoenas made it "impossible" for them to continue their cases.  Opening Brief p. 6.  This, also, is not true—unless

being forced to take a deposition or two makes a case "impossible." What the district court actually ordered (and Doe cannot stress enough how important this particular issue is to the copyright trolling phenomenon generally) was that Ingenuity 13 could try again for the ISP information, but first:

> "Ingenuity 13 must demonstrate to the Court, in light of the Court's above discussion, how it would proceed to uncover the identity of the actual infringer once it has obtained subscriber information—given that the actual infringer may be a person entirely unrelated to the subscriber—while also considering how to minimize harassment and embarrassment of innocent citizens." E.R. 147–48.

Requiring a pre-service discovery plan (perhaps a Rule 27 deposition of the ISP subscriber) to ensure that an appropriate defendant was identified, named and served, should not be an insurmountable obstacle to a legitimate litigation campaign.

Just before the Alan Cooper discovery became due, Prenda began voluntarily dismissing all of their cases per Fed R. Civ. P. 41(a)(1)(A)(i). *See* E.R. 296–97 (district court's order setting status conference on the "Alan Cooper" discovery responses).[10] Despite the Sanctioned Parties' arguments here, it was not impossible for them to proceed in the cases below, it was simply impossible to proceed without their fraud being uncovered.

---

[10] As a clear indication that the Alan Cooper discovery was the issue on everyone's mind by the end of January, the district court's order setting a status conference on the Cooper discovery, and Gibbs' notice of voluntary dismissal, were both filed on the same day, January 28, 2013.

**(d)    Before the Court Were Numerous Declarations and Documentary Exhibits Outlining a Pattern of Fraud, Forged Documents, Identity Theft, Disobedience of Court Orders, Straw Men and Offshore Shell Companies**

Notwithstanding Prenda's "effort to cut its losses and run out of court, using Rule 41 as an emergency exit,"[11] the district court issued an order to show cause regarding sanctions on February 7, 2013.  E.R. p. 1.[12]  Gibbs and Pietz were invited to file response briefs on the OSC issues by February 19, 2013. *Id.*  Of course, the facts outlined in these briefs were omitted from appellants' statement of the case.

Notably, the deposition of AF Holdings' 30(b)(6) representative was also scheduled for February 19th in another cases involving the same lawyers on both sides of the 'v'.  *See* Supp. E.R. 1119–1410 (redacted[13] transcript of AF Holdings 30(b)(6) deposition). Topic 6 to the deposition notice was, "AF Holdings' corporate structure, including past and present officers, directors, members, managers, and all other beneficial owners or other individuals with a pecuniary interest in the outcome of AF Holdings BitTorrent litigation campaign." *See* Supp. E.R. 1414.  Paul Hansmeier, appellant here, appeared as the corporate representative for AF

---

[11] *Cooter & Gell v.Hartmarx Corp.*, 496 U.S. 384, 390 (1990).

[12] The record shows that if the district court had not issued the OSC, Doe was planning to file a motion for sanctions.  Supp. E.R. 327–28 (post-dismissal email chain pre-dating issuance of Court's OSC where Gibbs was advised that defense counsel would "likely be seeking sanctions").

[13] The only thing redacted from the transcript is the deponent, Paul Hansmeier's home address.

Holdings.  His testimony was a *tour de force* in evasion. Supp. E.R. 1119–1410.[14]
Gibbs defended as counsel for AF Holdings, LLC.  *Id.*

Hansmeier testified in the deposition that AF Holdings, LLC was owned by an "undefined beneficiary trust," but he claimed that he did not know anything about the trust, including its name, who started it, when it was formed, who benefitted from it, etc. Supp. E.R. 1159 *et seq*.  Hansmeier explained his professed ignorance about the ownership of the corporation he was representing on the theory that he did not think corporate organization was a noticed topic, so he hadn't prepared for that topic.  *Id.*  Hansmeier also testified that Mark Lutz was the "sole employee" (Supp. E.R. 1196) of AF Holdings, and that Lutz was "essentially the CEO of AF Holdings" (Supp. E.R. 1148–49).  According to Hansmeier, Lutz received no compensation for his purported services as CEO of AF Holdings. *Id.*  Also according to Hansmeier, AF Holdings had recognized no revenue, paid no taxes, and had not filed tax returns (Supp. E.R. 1316–17) as all of its money was parked in Prenda lawyers' client trust accounts (Supp. E.R. 1320 *et seq*.).  This money was purportedly used to pay off  "litigation expenses," which included attorney's fees (Supp. E.R. 1227–28).

---

[14] After reading this deposition transcript in advance of the first evidentiary hearing, the court here remarked that it was "obvious that someone has an awful lot to hide." E.R. 194.

As to how the name "Alan Cooper" came to be on the copyright assignment agreements in the AF Holdings cases, Hansmeier blamed Steele and Lutz testifying,

> "AF Holdings makes use of corporate representatives to help prevent the -- I guess the officer, Mark Lutz, himself, from being targeted by these individuals. The manner in which Mr. Cooper was designated as a corporate representative was Mark Lutz asked attorney John Steele to arrange for a corporate representative to acknowledge the assignment agreement on behalf of AF Holdings. Mr. Steele did so and returned the assignment agreement to AF Holdings bearing the signature of Mr. Alan Cooper." Supp. E.R. 1242 [15].

The deposition concluded at 6:15 p.m. PST.  Supp. E.R. 1409.

As the Hansmeier 30(b)(6) deposition was underway in San Francisco, Gibbs' malpractice lawyers were finalizing his response to the OSC re: sanctions in the lead case below. *See* ECF No. 49 (Gibbs Response to OSC).  At 6:45 p.m. that same evening, Gibbs' counsel filed his OSC response.  *See id.*

According to Gibbs' sworn declaration in support of his OSC response,

> "Livewire Holdings LLC recently purchased AF Holdings LLC. AF Holdings LLC thereafter became a wholly owned subsidiary of Livewire Holdings LLC. In January of 2013, I was hired as in house counsel for Livewire Holdings LLC . I do not have a

---

[15] When testifying in Minnesota months later, Steele gave a different account of how the supposed dealings with Cooper unfolded.  *See AF Holdings, LLC v. John Doe(s)*, D. Minn. No. 0:12-cv-1445, ECF No. 67, 11/6/13, p. 7 (order reviewing Steele's testimony on Alan Cooper issue, an issue on which the court "expressly disbeliev[ed]" Steele).

financial or ownership interest in Livewire Holdings, LLC." *See* ECF No. 50 (Gibbs Declaration, ¶ 9).[16]

Gibbs made no mention of any kind of mystery trust. *See id;* ECF No. 49. Thus, on February 19, 2013, the story all morning, per Hansmeier, was that AF Holdings was owned by a mystery trust, but the story in the evening, per Gibbs' counsel, was that it had been "recently purchased" by Livewire Holdings, LLC.[17] ECF No. 50 (Gibbs Declaration, ¶ 9). Generally, Gibbs employed the Nuremburg defense, blaming unspecified "senior members" of Prenda for any potentially sanctionable conduct. *Id.*

At 11:59 p.m. that same night of the 19th, Pietz filed a response brief in the case below noting the conflicting stories about who owned the "client" that were proffered in Hansmeier's all-day deposition and in Gibbs' evening OSC response. Supp. E.R. 298–317 (Excerpt of Pietz Response to OSC). This brief also addressed:

(1) <u>The background on the Alan Cooper issue</u>. On this point, the OSC response brief referred back to the extensive declaration previously filed in opposition to the disqualification motion. *Id. citing* Supp. E.R. 124–295. It also pointed out that nobody had yet denied that the copyright assignments attached as

---

[16] Although the table of contents to appellants' excerpts of record indicate that this document can be found at E.R. 167, the excerpts actually filed appear to omit E.R. 151 to 187.

[17] Livewire Holdings, LLC was another of Prenda's shell companies, also purportedly owned by Lutz, of slightly later vintage, which listed its office as a UPS store in Washington, DC. *See* Supp. E.R. 301.

Exhibit B to the complaints in each of the AF Holdings cases were actually forgeries (a telling fact that remains true even now on appeal). Supp. E.R. 308.

    (2)   <u>Mark Lutz's status as a former paralegal for Steele Hansmeier</u>. The supposed "client" mastermind overseeing a team of 20+ lawyers, and hundreds of federal court cases nationwide, was the same ***former paralegal*** of Steele's, who had attempted to pass himself off as the "client representative" in Judge Scriven's court in Florida. Supp. E.R. 309.

    (3)   <u>The apparent existence of two other Prenda "client" straw men</u>. Both "Anthony Saltmarsh / Salt Marsh" and "Alan Moay / Alan Mony / Alan Mooney" were names associated with Prenda's "clients," who, like Cooper and Lutz, could be personally connected to John Steele. Supp. E.R. 310–13.

    (4)   <u>Prenda's clear violation of the court's order staying discovery</u>. Even under Gibbs' professed interpretation of the court's order forbidding further discovery, there was evidence in the form of declarations from ISP representatives that Prenda was still "pressuring the ISP's to respond to subpoenas" after discovery was ordered to a halt. Supp. E.R. 303; *citing* Supp. E.R. 511 (Dec'l. of Bart Huffman); Supp. E.R. 563 (Dec'l. of Camille D. Kerr).

    (5) <u>Various other unsavory shenanigans</u>. Doe's OSC response also noted Prenda's apparent collusion with back-pocket defendants (who would then stipulate to discovery against their alleged "co-conspirators"), as well as dubious

attempts to obtain ISP subscriber information from state courts using state pre-suit discovery mechanisms less strict than Fed. R. Civ. Proc. 27. Supp. E.R. 314.

Each of the foregoing arguments in Pietz's initial OSC response brief were supported by documentary exhibits, some of which, <u>Exhibits A</u> to <u>O</u>, had been previously filed in connection with the disqualification motion (Supp. E.R. 145–295), and some of which, <u>Exhibits P</u> to <u>DD</u> (Supp. E.R. 323–520), were attached to and authenticated in a supplemental declaration by Pietz (Supp. E.R. 318–21).

After the initial briefs described above were filed, the court invited both parties to file a reply brief by March 4, 2013, and ordered Gibbs to file a separate response by March 1, 2013, identifying the "senior members" at Prenda who were directing the litigation. E.R. p. 12.  Gibbs timely responded and identified Steele and Hansmeier as the main principals directing his actions (although Duffy was the nominal head of the firm, at least according to Prenda).  E.R. p. 181.

Doe's OSC reply brief (ECF No. 59) pointed out the following inconsistencies, among others, in Prenda's different representations to various courts:

(1)    <u>John Steele's Conflicting Stories About His Role With Prenda</u>. John Steele told courts in various cases that: (i) he was "***of counsel" to Prenda*** on 4/20/12. (Supp. E.R. 180); (ii) he was "***not an attorney with any law firm***" on 11/27/12, when questioned by Judge Scriven in Florida (Supp. E.R. 81); (iii) but he

was **back to being "of counsel" to Prenda** on 2/13/13 in the St. Clair County *Guava, LLC* case (Supp. E.R. 320, ¶ 15).

        (2)      <u>Even More Different Stories About AF Holdings' Ownership</u>.  At various different times, in different cases, the following individuals have been associated with the "client" AF Holdings:  (i) **Alan Cooper** as "assignee" (12/20/2011) (*e.g.*, E.R. 52); (ii) somebody signed the name "**Salt Marsh**" as the "undersigned"  "**AF Holdings Owner**"[18] (7/20/12) on an ADR Certification (Supp. E.R. 346); (iii) according to Hansmeier, AF Holdings was **owned by a mystery trust** (2/19/13, 11:00 a.m.), and never had any other members or employees other than its manager Mark Lutz (Supp. E.R. 1142 (Hansmeier 30(b)(6) deposition transcript)); and (iv) according to Gibbs's counsel AF Holdings was **owned by Livewire Holdings, LLC** (2/19/13, 6:45 p.m.) (ECF No. 50, ¶ 9) (Gibbs Declaration).

        (3)      <u>More Information About Yet Another Prenda Straw Man</u>.

Prenda also had a hard time keeping the name straight for another individual—Allan

---

[18] At one point in Hansmeier's deposition (Supp. E.R. 1167), a reader can almost picture the figurative light bulb going off for Hansmeier that one way to try and explain two of these lies would be to say that the mystery trust is "named" Salt Marsh.  In reality, "Salt Marsh" was probably originally a veiled reference to a man named Anthony Saltmarsh who had lived with John Steele's sister (presumably, her longtime boyfriend) at several Arizona residences, including an address also linked to "Alan Cooper" and John Steele.  Supp. E.R. 350–51 (Ranallo Dec'l.); *see also* Opening Brief at p. i (Appellant's corporate disclosure statement identifying the owner of AF Holdings, LLC as the "Salt March [sic]" trust, and the owner of Ingenuity 13 as some other heretofore unheard of mystery trust).

Mooney—supposedly signing sworn papers on behalf of a mysterious offshore "client". Over the course of a few weeks, Prenda gave three different spellings of Mooney's name after being challenged on the issue in court, and Mooney, who had let Hansmeier represent him in a class action objection, denied knowing about the Prenda porn entities. Supp. E.R. 415–18; ECF No. 51-1; Supp. E.R. 598; Supp. E.R. 605; Supp. E.R. 648 (*Minneapolis Star Tribune* article re: Hansmeier and Allan Mooney where Mooney was *quoted* denying knowledge of the Prenda-related entities that listed him as a corporate principal).

(4)  <u>Prenda's Justification For Naming Defendants Was Dubious</u>.

Doe also argued that Prenda had not conducted an adequate, good faith investigation, as required by Fed. R. Civ. P. 11(b)(3), prior to naming and serving Wagar and Denton as defendants in the consolidated cases below. Does' contention was supported by Google map results showing that, despite Gibbs' assertion to the contrary, there were many neighbors within typical wireless internet range of the defendants' houses. Supp. E.R. 609–10 (Google map overviews); *see also* Supp. E.R. 586–87 (Pietz Dec'l. explaining the distance of the different colored radii pictured and evidencing typical wireless router range).

Finally, in order to help the court keep track of the dizzying array of shell companies, suspected straw men, and titles used by Prenda attorneys and other personnel, Doe also included in the reply brief an explanatory organizational

diagram (ultimately adopted by the district court) that was prepared by defense counsel based on the various documents as a demonstrative exhibit in advance of the evidentiary hearing.  Supp. E.R. 607.

**(e)     The Court Held Two Evidentiary Hearings: At The First, Alan Cooper Testified Credibly That The Copyright Assignments Bearing His Name Were Forgeries, At the Second, Prenda Principals Pled The Fifth**

Having reviewed all of the briefing, including Gibbs' identification of the "senior members" of Prenda, on Wednesday March 5, 2013, the court ordered the Prenda Principals, plus Mark Lutz, Peter Hansmeier (the purported computer forensic "expert"; Paul's brother), Angela Van Den Hemel (a Prenda paralegal involved in violating the court's discovery order), and both "Alan Cooper, of AF Holdings, LLC" and "Alan Cooper, of 2170 Highway 47 North, Isle, MN 56342" to appear at the sanctions hearing set for Monday afternoon March 11, 2013. E.R. 14–15.  Gibbs was ordered to serve everyone, and his counsel did so, except for Minnesota Alan Cooper, who was served by defense counsel.  *See* E.R. 15.

At 2:55 p.m. Friday afternoon March 8, 2013, counsel for Doe was served, by fax and email, with a purported emergency *ex parte* application seeking withdrawal of the court's order directing the Prenda Principals and others to appear.  ECF No. 75.  Despite the supposed emergency basis for the application, and the upcoming Monday afternoon sanctions hearing, the emergency *ex parte* application was not e-filed, rather, it was sent downstairs to the paper intake window, and no courtesy

copy was immediately provided to chambers. *Id.* Thus, the filing was done in such a way that Prenda could claim an emergency application was filed Friday, but the court was basically guaranteed not learn about it until the following Monday, the day of the hearing. *Id.* This was the gamesmanship the district court would later refer to, and which appellants' brief ignores, regarding the Prenda Principals' personal jurisdiction objections.

At the first evidentiary hearing on March 11, 2013, Alan Cooper testified credibly that he had never given Steele nor anyone else permission to use or sign his name in connection with any companies, and that the signatures on the assignments were not his. E.R. 208-24. He testified similarly that he never authorized anyone to sign his name, in any form, in connection with the Ingenuity 13, LLC Rule 27 petition. *Id.* Cooper testified that he knew Steele did some kind of Internet porn business, and was making a lot of money, but hadn't been involved in it. Cooper testified that he became suspicious when Steele told him "if anybody contacts you about any of my law firm or anything that has to do with me, don't answer and call me." E.R. 210. Cooper testified that after his attorney Godfread filed an initial appearance in the Minnesota cases, Steele immediately attempted to call Cooper directly, five times. E.R. 219. The record below includes voicemails from Stele subsequently seeking to intimidate Cooper and threaten litigation against him. Supp.

E.R. 682–88 (transcripts of voicemails played at the March 11, 2013, evidentiary hearing).

Cooper was cross-examined by outside counsel for Gibbs at that first evidentiary hearing. Specifically, Cooper was asked if he knew a man named Brent Berry, and counsel for Gibbs attempted to impeach Cooper on the point of whether he consented to use of his name in connection with Prenda's porn companies. E.R. 221–24.

Representatives of two ISPs then testified and established that Prenda continued to attempt to obtain subpoena returns after the district court issued its order vacating the orders authorizing early discovery and quashing the subpoenas. E.R. 225–37.

Finally, Gibbs was called to the stand by his counsel, and he proceeded to generally confirm, both on direct and on cross-examination, that he had been taking orders in the cases below from John Steele and Paul Hansmeier. E.R. 260-301. All of the exhibits received into evidence at the first hearing (which were numbered) are found at Supp. E.R. 920–1113.

After the conclusion of the first hearing, on March 14, 2013, the court issued and order denying the 11th hour personal jurisdiction objections lodged by Steele, Duffy and Hansmeier, and ordering each of the Sanctioned Parties to appear at a

second hearing.  E.R. 16.  Gibbs' was again ordered to serve everyone, and his counsel filed a proof of service confirming that he did so.[19]  ECF No. 92.

At the second hearing, on April 2, 2013, each of the Sanctioned Parties did appear in person.  E.R. 306–18.  However, their respective counsel announced that they would be asserting a blanket Fifth Amendment privilege against self incrimination, and would therefore refuse to take the stand in the face of the court's questions.  *Id.* Counsel for Duffy and Prenda, Heather Rosing, indicated she wanted to make some legal arguments.  *Id.* The court made clear that it wanted to hear evidence, not argument, but neither Rosing nor any of the other lawyers mentioned anything about wanting to put on any witnesses or offer any other kind of evidence; just argument.  *Id.* The court entertained some argument from Rosing, but ultimately invited her to make her arguments more fully via a written brief.  *Id.*

After the second hearing, on April 5, 2013, defense counsel submitted a declaration, with supporting exhibits, substantiating Doe's fees and costs incurred as of that date.  Supp. E.R. 689–714.

Appellants then submitted various briefs arguing why the court lacked jurisdiction and other points, many repeated here on appeal.  *See* ECF No. 108, 110.  The first mention of a purported right to a jury trial was made by Steele's outside

---

[19] Appellants did not challenge the sufficiency of service or process on appeal. Accordingly, they have waived the issue. *TRW Inc. v. Andrews*, 534 U.S. 19, 34 (2001).

counsel on April 10, 2013, over a week after the second evidentiary hearing. *See*

ECF No. 110.  Doe requested leave and filed a reply to these briefs (ECF No. 117)

and submitted several rebuttal exhibits, which would have been the subject of

examination had any of the Prenda Principals taken the stand at the second hearing

(Supp. E.R. 715–802).  The Sanctioned Parties then filed a sur-reply.  ECF No. 120.

**(f)    The Sanctions Order Awarded Monetary Sanctions To Doe, In The Form Of Attorneys' Fees Adjusted Upwards, And Referred The Prenda Principals For Criminal and Disciplinary Investigation**

On May 6, 2013, the district court's order issued, and Prenda and its related

attorneys and entities were found by the district court to have engaged in "brazen

misconduct and relentless fraud" in connection with Prenda's campaign of serial

copyright infringement litigation.  E.R. 19–29.

In view of appellants' bad faith conduct, the district court determined that "an

award of attorney's fees to Defendants is appropriate.  This award compensates them

for expenses incurred in this vexatious lawsuit, especially for their efforts in

countering and revealing the fraud perpetrated by plaintiffs."  After reviewing the

cost and fee declarations that had been previously submitted by defendant-appellee

John Doe's counsel, which the court found to be reasonable, the court imposed a

monetary sanction as follows:

> "Therefore, the Court awards attorney's fees and costs in the sum of $40,659.86 to Doe: $36,150.00 for Pietz's attorney's fees; $1,950.00 for Ranallo's attorney's fees; $2,226.26 for Pietz's costs; and $333.60 for Ranallo's costs. As a punitive measure,

the Court doubles this award, yielding $81,319.72. This punitive multiplier is justified by Plaintiffs' brazen misconduct and relentless fraud. The Principals, AF Holdings, Ingenuity 13, Prenda Law, and Gibbs are liable for this sum jointly and severally, and shall pay this sum within 14 days of this order." Sanctions Order, E.R. 28:11–17 (footnote omitted).

In addition, the Sanctions Order referred the Prenda Principals to each of their respective state and federal bar disciplinary authorities, to the U.S. Attorney's Office, and the IRS Criminal Investigative Division. Appellants do not challenge the non-monetary sanctions on appeal.

**(g)    Since Being Sanctioned, The Prenda Principals Have Continued To Litigate In Bad Faith**

Since being sanctioned, the Prenda Principals have continued to litigate in bad faith, right up to and including the opening brief on appeal.

Most relevant here is the dubious manner in which the Sanctioned Parties handled securing an appellate bond, which has generated a separate appeal. E.R. 601–603. Although the sanctioned parties were ordered to make good on the sanctions award within 14 days, i.e., by May 20, 2013 (Sanctions Order, E.R. 29:11), they did not do so. Instead, they missed the deadline due to further eleventh-hour gamesmanship, which led directly to the requirement of a high bond amount, and the impositions of conditions favorable to John Doe. The context of the district court's order on the appellate bond is important, so it is set forth here in some detail.

On May 16, 2013, without any attempt to meet and confer beforehand,

without any prior notice, without first seeking relief from the district court, and without any mention of any kind of bond, Paul Hansmeier, acting "*In Propria Persona*," filed an "Emergency Motion" (it would be the first of several) in the Court of Appeals seeking a stay of enforcement pending appeal. Appeal No. 13-55859, Dkt No. 3. Since the motions unit construed the motion as seeking relief within four days, Doe was pressed to respond within 24 hours. Appeal No. 13-55859, Dkt. No. 4. The Motions Panel denied Hansmeier's request for a stay pending appeal on the morning of May 20, 2013, "without prejudice to renewal, if necessary, upon the filing and disposition of such request in the district court." Appeal No. 13-55859, Dkt. no. 6.

On the afternoon of May 20, 2013, *i.e.*, a few hours before the district court's deadline for payment of the sanctions, Paul Duffy announced for the first time, by email to defense counsel, that Prenda was prepared to post a bond, for 125% of the value of the fee award below. Supp. E.R. 839. Shortly thereafter, Prenda Law, Inc. improperly filed an application in the district court, as an exhibit attached to its notice of appeal, seeking a stay pending appeal, but, again, not mentioning anything about a bond. ECF No. 157-1.

The evening of May 20, 2013, defense counsel responded in good faith to Mr. Duffy's first and only attempt to meet and confer on the specifics of an appellate bond, emailing all the parties, and raising a variety of substantive issues as to

amount and conditions for a bond. Supp. E.R. 838–39. Mr. Duffy did not immediately respond, nor did any of the other sanctioned parties. *See id.*

On May 21, 2013, the district court denied Prenda's application for a stay pending appeal, threatened possible new sanctions to accrue daily for failure to tender payment, but allowed that upon posting of a supersedeas bond, enforcement of the fee award and any additional sanctions would be stayed. E.R. 30–31.

On May 22, 2013, counsel for John Doe again emailed all of the lawyers involved in the case to see if anyone had any response to the substantive issues previously raised by defense counsel. Mr. Duffy was the only one who responded, writing, "You had no substantive points. If you can think of some and can articulate them coherently I would be glad to consider them. Thanks for thinking of me." Defense counsel responded to the group noting that Mr. Duffy's response was unhelpful, and asking if anyone else had an opinion. The only response was received approximately 45 minutes later, in the form of a bizarre reply from Mr. Duffy, which was presumably intended to resemble an auto-response from a SPAM filter. Supp. E.R. 840–41.

The next day, May 23, 2013, Duffy filed a motion in the district court for approval of a bond of $101,650 (125% of the fee award), which was apparently posted that day on behalf of all parties except Gibbs. Of course, Duffy's motion failed to address or even acknowledge any of the substantive concerns previously

raised by defense counsel as to amount or conditions for the bond.  E.R. 574.

John Doe, responded to Duffy's motion on June 3, 2013, asking that the bond posted be conditionally approved, subject to the posting of an additional bond to cover additional costs on appeal including attorney's fees, and subject to certain other conditions. Supp. E.R. 824–42.  Importantly, the foregoing record of Prenda's bad faith engagement on the substantive issues relating to the bond was before the district court. Supp. E.R. 840–41.  Along with the response and copies of the relevant meet and confer email exchange, such as it was, John Doe submitted a proposed order, which the court entered (and immaterially modified a few days later), before Duffy could file a reply.  *See* E.R. 587.

This order requiring an additional bond and imposing further conditions was then separately appealed. E.R. 601.  The amended bond order also prompted the sanctioned parties to engage in another round of eleventh-hour duplicative "emergency" briefing, both in the district court (Hansmeier's emergency motion for reconsideration at E.R. 596, 6/10/13) and simultaneously in the Court of Appeals (Prenda's emergency motion, Appeal No. 13-55881, ECF No. 9, 6/14/13).

The district court denied Hansmeier's motion for reconsideration (Supp. E.R. 850), and the Motions Panel denied the emergency motion 2-1, citing *Azizian v. Federated Dep't Stores, Inc.*, 499 F.3d 950, 955 (9th Cir. 2007) (court reviews objections to amount of bond on appeal for abuse of discretion). Appeal No. 13-

55859, Dkt. No. 16.

Additional examples of the Prenda Principals' bad faith litigation, *since they were sanctioned*, include: (1) John Steele's frivolous motion to sanction undersigned defense counsel Pietz, which was denied, and for which Steele was himself sanctioned, on July 18, 2013, after a hearing (Supp. E.R. 882–86). (2) Appellate counsel's outrageous response, on October 20, 2013, to a friendly warning that he might consider being careful before signing a pleading representing that "there is no evidence in the record of X," and offering to answer any questions appellant's counsel might have about the record. Req. FJN, Exh. 1[20]. Finally, (3) appellants' counsel then did exactly what he was cautioned about, when he represented to this Court in the Opening Brief that "the record on appeal is devoid of any information from which the District Court could reasonably infer that the individual Appellants were real parties in interest." (Opening Brief p. 26). As explained in this brief, there is *substantial* evidence supporting the district court's findings that the lawyers here were, in fact, their own clients.

/ /

---

[20] Doe has concurrently filed a motion for request for judicial notice of the email correspondence warning the Sanctioned Parties' appellate counsel about making such an argument.

**(h)     Gibbs Submitted Financials With His Motion for Indicative Ruling That Support The District Court's Findings That Steele And Hansmeier Are Behind Prenda And The De Facto Real Parties In Interest**

A month before the opening briefs were due in these appeals, Brett Gibbs filed a motion for indicative ruling in the district court (ECF No. 240), supported by a declaration explaining and authenticating several remarkable documentary exhibits (Supp E.R. 887–919).  Gibbs accused the Sanctioned Parties of an additional forgery, designed to cover their tracks.  Supp. E.R. 891, ¶ 21.  He also made reference to an issue which has now been litigated in another court, namely evidence suggesting that Prenda was actually responsible in the first place for seeding onto BitTorrent the movies it complained were being infringed.  Supp. E.R. 891, ¶ 20; *see also AF Holdings, LLC v. Navasca*, N.D. Cal. No. 3:12-cv-2396, ECF No. 116, 9/16/13 (report and recommendation on defendants motion for sanctions adopting the findings from the Sanctions Order here and also noting that after an evidentiary hearing there "AF failed to oppose Navasca's arguments that Steele and/or Hansmeier. . .(3) themselves uploaded the Video to Pirate Bay to induce others to download the Video").

Most importantly, Gibbs also submitted a 2012 profit and loss statement and a 2012 balance sheet for Prenda Law, Inc. that were shared with him via a Dropbox folder on his computer in early 2013.  Supp. E.R. 888, 904–19.  Gibbs also averred that Hansmeier told him that an entity which appears in these records, "Under the

Bridge Consulting," is owned 50/50 by Paul Hansmeier and Steele. Supp. E.R. 889, ¶ 18. The financials generally tend to show that despite the level of insulation Steele and Hansmeier tried to put between themselves and Prenda, they were in fact receiving most of the money from Prenda's operations. Supp. E.R. 904–19. Most of Prenda's income was journaled as attributable to "Pirates." Supp. E.R. 905. The figures show that of the $1,343,806.78 in "Payments to Old Owners" that Prenda made in 2012, all of it, save for $37,069 to Duffy, went to Steele and Paul Hansmeier, either individually or through "Under the Bridge Consulting". Supp. E.R. 908–09. The $1.34 million that Steele, Hansmeier and Duffy extracted from Prenda represents almost 70% of the $1.93 million in total income Prenda earned in 2012 (Supp. E.R. 905). *See id.* Notably absent from these financials are any payments or other disbursements to "clients" other than a few checks to Lightspeed (an actual porn company and older client of Prenda). *See* Supp. E.R. 904–19.

The Sanctioned Parties' appellate counsel was warned several times that John Doe would consider this new information from Gibbs as properly part of the record and would address it on appeal. *See, e.g.,* Appeal No. 13-55859, Dkt. No. 16-1, 11/4/13, p. 4.; Req. FJN, Exh. 1. However, the only reference the Sanctioned Parties make to Gibbs' motion for indicative ruling or the accompanying financial records and other documents is in a footnote. Opening Br., p. 33, fn. 5. In the footnote, they lament that they "have had no opportunity to counter Gibbs' assertion" that the

Prenda Principals have an interest in Ingenuity 13 and AF Holdings. Opening Br., p. 33, fn. 5.  Accordingly, the Sanctioned Parties have waived any potentially rehabilitative arguments or objections to Gibbs' financial and other evidence on appeal, and they should not be allowed to raise such issues for the first time in their reply.

At a minimum, this information establishes that Steele and Hansmeier are alter-egos of sanctioned party Prenda Law, Inc, notwithstanding their past protestations that they are merely "of Counsel" to the firm.

/ /

## IV.  SUMMARY OF THE ARGUMENT

Three points should be beyond any kind of credible dispute in these appeals. First, there is ample evidence in the record supporting the district court's findings, which are owed great deference, that the cases below were characterized by "brazen misconduct and relentless fraud," justifying the imposition of compensatory sanctions.  Second, the district court was well within it its discretion to make the sanctions payable jointly and severally, not just by the purported "client" offshore shell companies, but also by the three lawyers found to be truly behind the whole scheme, and their law firm, Prenda Law, Inc.  Third, all of the Sanctioned Parties had appeared before the court and were afforded specific notice of the conduct deemed wrongful and an opportunity to be heard, which is all that was required before the court imposed civil, as opposed to criminal, sanctions.  Accordingly, the award of reasonable attorneys' fees and costs to John Doe as a civil, compensatory sanction must be affirmed. *See F.J. Hanshaw Enter. v. Emerald River Develop.*, 244 F. 3d 1128 (9th Cir. 2001) ("*Hanshaw*").

The sanctioned parties contend that the district court's award of what it styled a "punitive multiplier" transmuted the proceedings below into a completely criminal affair, which should have resulted in them receiving heightened due process protections.  They argue that the whole award should be invalidated because there was no jury, no independent prosecutor, and because the lawyers' invocations of

their Fifth Amendment rights against self-incrimination were used against them.

What appellants do not cite is any case suggesting that if part of a sanctions award is

reversible, then the whole rest of the award should also be reversed; indeed, the law

on this Circuit says just the opposite. *See, e.g., Hanshaw,* 244 F. 3d at 1145

(reversing substantial $500,000 "flat, unconditional fine" payable to United States as

criminal in nature, but affirming $200,000 compensatory payment to opposing party

under court's inherent authority).

A more difficult question on review is what to make of the "punitive

multiplier" portion of the award to John Doe.[21] Is it punitive damages of the sort

often awarded in civil cases?  "Aggravated" or "deterrent" damages?[22]  An upward

enhancement of the attorneys' fee lodestar?  Or a criminal penalty?  Doe would

respectfully submit that the "punitive multiplier" award here should be affirmed

because the nature of the sanction imposed is closer to the first several possibilities,

which require only civil due process, than to the latter. *See State Farm Mut. Auto.*

*Ins. Co. v. Campbell,* 538 U.S. 408, 417 (2003) ("[a]lthough these awards serve the

same purposes as criminal penalties, defendants subjected to punitive damages in

---

[21] The sanctioned parties do not challenge the non-monetary aspect of the sanctions imposed, namely their respective referrals to relevant prosecutorial and disciplinary authorities, and the notifications to judges in the lawyers' other pending cases. Appellants' failure to separately and distinctly address this issue in their opening brief renders the issue forfeited. *TRW, Inc.*, 534 U.S. at 34.

[22] *See* Markel, D., *How Should Punitive Damages Work*, 157 U. PA. L. REV. 1383, 1424–35 (2009).

civil cases have not been accorded the protections applicable in a criminal proceeding"); *Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 100 F.3d 691, 697-699 (9th Cir. 1996) (affirming 2.0 multiplier enhancement of attorney's fee lodestar).

In the alternative, if the Court decides that any part of the fee award must be vacated, then the case should be remanded for the district court to consider making findings under a lodestar enhancement approach, as well as several other issues. Notably, even though John Doe was never technically served as a defendant, if the court's ability to issue a deterrent sanction using civil procedures truly depends on whether a Rule 11 *motion* was brought (as opposed to an OSC issued), John Doe should be permitted to bring such a motion here on remand.  Further, the district court should consider compensation to Doe for reasonable attorney's fees and costs for the substantial amount of work in the lead case below that was performed subsequent to the May 6, 2013 Sanctions Order, which was made necessary by Prenda's continuing bad faith litigation tactics.  In addition, the district court should also consider imposition of the maximum "non-serious" penalty, which this Court has suggested may be something close to $7,500, when adjusted for inflation.

Finally, the district court's bond order should be affirmed as an exercise of discretion, given appellants' bad faith responses to attempts to meet and confer on the amount and conditions of the bond.

# V.  ARGUMENT

**(a)**  **The Award of Full Attorney's Fees And Costs To John Doe Should Be Affirmed Because Compensatory Sanctions Are Properly Issued Under The Court's Inherent Authority And Prenda Richly Deserves It**

    (1)  <u>Standard Of Review For Imposition Of Sanctions Pursuant to Court's Inherent Authority</u>

As stated by the Ninth Circuit in *Hanshaw*, all of which is applicable here,

> "We review the district court's imposition of sanctions pursuant to its inherent power for a abuse of discretion.  *See Chambers v. Nasco, Inc.*, 501 U.S. 32, 55 (1991).  With respect to sanctions, a district court's factual findings are given great deference.  *See Primus Auto Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997).  A district court's discretion to disregard a corporate form and to impose liability under the equitable "alter ego" doctrine is reviewed for clear error.  *See Commodity Futures Trading Comm'n. v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1112 (9th Cir. 1999).  Denial of a recusal motion is reviewed for abuse of discretion."  *See United States v. Hernandez*, 109 F.3d 1450, 1453 (9th Cir. 1997" (additional reporter references omitted).

*Hanshaw*, 244 F.3d at 1135.

Further, The district court's factual finding concerning appellants' improper motivation to dismiss the cases below (E.R. 22, ¶ 6) cases must be accepted on appeal unless this Court, based on the totality of evidence before it, has a "definite and firm conviction that a mistake has been committed." *Concrete Pile & Products of Calif., Inc. v. Construction Laborers Pension Trust for So. Calif.*, 508 U.S. 602, 622 (1993).

The district court's orders may be affirmed "on any ground fairly presented by the record," even grounds not specifically relied upon below. *New Kids on the Block*

*v. News America Pub., Inc.*, 971 F.2d 302, 305 (9th Cir. 1992).  The Court of Appeals is "not bound by the mere label the district court gave its compensatory award."  *Hanshaw,* 244 F.3d at 1143; *citing Primus,* 115 F.3d at 648.

### (2)    It Is Well-Settled That A U.S. District Court May Impose Civil, Compensatory Sanctions Pursuant To Its Inherent Authority

District courts may issue sanctions pursuant to their inherent authority provided that the sanctioned parties have acted in bad faith and have received adequate due process in connection with being sanctioned.  *Hanshaw*, 244 F.3d at 1136–44; *Chambers*, 501 U.S. 43–46, 50.  "A court has the power to conduct an independent investigation in order to determine whether it has been the victim of a fraud."  *Chambers*, 501 U.S. at 44; *citing Universal Oil Products Co. v. Root Refining Co.,* 328 U. S. 575, 580 (1946).  "If a court finds 'that fraud has been practiced upon it, or that the very temple of justice has been defiled,' it may assess attorney's fees against the responsible party." *Chambers*, 501 U.S. at 46; *quoting Universal Oil*, 328 U.S. at 580.   "The imposition of sanctions in this instance transcends a court's equitable power concerning relations between parties and reaches a court's inherent power to police itself, thus serving the dual purpose of 'vindicat[ing] judicial authority without resort to the more drastic sanctions available for contempt of court and mak[ing] the prevailing party whole for expenses caused by his opponent's obstinacy.'" *Chambers*, 501 U.S. at 46; *quoting Hutto v. Finney,* 437 U. S. 678, 689, n. 14 (1978).

"In *Chambers*, the Court left no question that a court may levy fee-based sanctions when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, delaying or disrupting litigation, or has taken actions in the litigation for an improper purpose." *Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001) *citing Chambers,* 501 U.S. at 45–46 & n.10  (1991) (affirming issuance of sanctions under court's inherent authority where some but not all of the bad-faith conduct was beyond the reach of Rule 11 and 28 U.S.C. § 1927).

When the court relies on its inherent authority to impose sanctions, the level of process due depends on whether the court imposes civil sanctions, which are usually either compensatory or coercive in nature, or sanctions that are criminal in nature.  *See Hanshaw,* 244 F.3d at 1137–38.  In explaining the difference between civil and criminal sanctions, the *Hanshaw* court followed the principles from *Bagwell*, a contempt case, and noted,

> "'[W]hether a contempt is civil or criminal turns on the 'character and purpose' of the sanction involved. . . .  [A] contempt sanction is considered civil if it 'is remedial, and for the benefit of the complainant,'' and criminal if it is 'punitive, to vindicate the authority of the court.' A fine is civil and remedial if it 'either 'coerce[s] the defendant into compliance with a court's order, [or]. . .compensate[s] the complainant for losses sustained.''' ) (citations omitted).

*Id. quoting Union Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827–29 (1994) (citations omitted).

Following the Second Circuit's reasoning from *Mackler Prods., Inc. v. Cohen,* 146 F.3d 126, 127–28 (2d Cir. 1998), the *Hanshaw* court held that before a fine that is "criminal in nature" may be imposed, the sanctioned party must be afforded the same due process available in a criminal contempt proceeding. *Hanshaw,* 244 F.3d at 1139. The court explained that this includes: (i) an independent prosecutor, (ii) jury trial, and (iii) reasonable-doubt standard of proof. *Id.* at 1140–42.

The sanctioned party in *Hanshaw* had argued on appeal that an award of attorneys' fees to the other side was erroneous due to the lack of enhanced, criminal due process protections, but the Ninth Circuit disagreed. The court explained,

> "Unlike a punitive sanction, particularly one that is payable to the government or the court, a compensatory award payable to a party does not place the court in a prosecutorial role. When determining whether and how much to compensate a party, the court sits in the same adjudicatory position it does when it resolves most disputes. Although the court has an institutional interest in the matter, the court in essence is resolving a dispute between litigants: one party claims it was wronged by the other and wants to be reimbursed for the losses it sustained. For these reasons, when the court is adjudicating a compensatory civil sanction, the traditional procedural protections applicable to civil proceedings are sufficient to satisfy the Constitution's requirement of due process."

*Hanshaw,* 244 F.3d at 1142.

Accordingly, where the party who was sanctioned pursuant to the court's inherent authority had been afforded notice and an opportunity to respond, but not the full panoply of criminal due process, the *Hanshaw* court reversed a "substantial

'flat, unconditional fine'" payable to the court as "criminal in nature," (*Hanshaw*, 244 F.3d at 1138 *quoting Bagwell,* 512 U.S. at 829) but affirmed the award of attorney's fees to the other party as a compensatory civil sanction and an appropriate exercise of the court's discretion (*Hanshaw*, 244 F.3d at 1142–44)*.*

> (3)    Here, The District Court Had Jurisdiction And Authority To Sanction All Of The Sanctioned Parties Including The Prenda Principals

The Prenda Principals do not challenge the district court's jurisdiction over their persons directly; instead, they make an argument that "the district court's inherent sanction authority does not extend" to them.  Opening Br. p. 29.

The district court case on which the Sanctioned Parties principally rely, *Helmac Prods. Corp. v. Roth Corp.*, 150 F.R.D. 563, 567 (E.D. Mich. 1993), acknowledges the relationship between jurisdiction and a court's inherent sanction authority.  *Id.* (noting that the Supreme Court rejected a strict jurisdictional limit to a court's inherent sanction authority in *Chambers*).  Doe will address jurisdiction first, and then come back to *Helmac*.

> (A)    *The District Court Had Personal Jurisdiction Over Each Of The Sanctioned Parties*

The court's jurisdiction over the three entities, nominal plaintiffs Ingenuity 13 and AF Holdings, and Prenda, the plaintiff's law firm, can hardly be disputed, since they filed the instant suits. The Opening Brief really only challenges the court's authority to sanction the individual Prenda Principals.

Paul Duffy is a member of the State Bar of California (Supp. E.R. 821), the self-reported "sole principal" of Prenda Law, Inc. (Supp. E.R. 471), the law firm which brought the instant cases in California (e.g., E.R. 113), albeit without having registered or qualified to do business in California or its courts (E.R. 257).

Paul Hansmeier travelled to San Francisco, California to appear as a corporate 30(b)(6) deponent on behalf of AF Holdings in a case pending in the Northern District of California.  Supp. E.R. 1121.

John Steele signed multiple settlement demand letters sent by mail to defendants in AF Holdings and other cases in the California federal courts (*e.g.*, Supp. E.R. 637, 1065-76) and a defense lawyer who had dealt with Steele averred in an affidavit received into evidence at the evidentiary hearing that Steele had signed a subpoena in a California BitTorrent case (Supp E.R. 1041–64).

In addition to the foregoing, of course, there is the testimony (E.R. 260–301) and documentary evidence (Supp. E.R. 887–92, 901–03) from Gibbs identifying Steele and Paul Hansmeier as the two people really pulling the strings in the cases below.  These facts conclusively establish specific personal jurisdiction.

Further, the Prenda Principals were all duly served and appeared through the same shared counsel, prior to the first evidentiary hearing.  ECF No. 95.

Accordingly, in its order issued after the first hearing, setting the second hearing, the district court was correct to conclude, based on the foregoing facts

which were before it, that "there is at least specific jurisdiction over these persons because of their pecuniary interest and active, albeit clandestine participation in these cases." E.R. 16. The district court also ordered them all to appear and show cause at the second hearing. *Id.* They were duly served with that order (a point they did not dispute) (ECF No. 92) (Dec'l. of Gibbs' counsel re service) and they each then appeared both in person and through different respective counsel at the second hearing. E.R. 306–11. Thus, they were clearly duly served with and "subject to" that order requiring them to show case as to why they should not be sanctioned.

The Prenda Principals did not object to service of process in the district court, they actually appeared and argued the issues on the merits, and they did not raise any such issue in their opening brief on appeal. Accordingly, the Sanctioned Parties waived any challenge to the district court's personal jurisdiction. *TRW Inc.*, 534 U.S. at 34.

(B)    *Helmac Deals With Extending The Court's Inherent Sanction Authority To Non-Lawyer, Non-Parties Over Whom The Court Lacks Personal Jurisdiction, Which Is Not The Issue Here*

Initially, it must be pointed out that the thoughtful test devised and announced by the district court in *Helmac* attempts to solve a problem not present here. *Helmac*, 150 F.R.D. at 567. *Helmac* concerned a court's attempt to resolve the thorny issue of what to do about a non-lawyer, non-party, *who was a Canadian over whom the court lacked personal jurisdiction*, who nevertheless disrupted litigation by willfully

destroying documents.  *Id.* at 564 (procedural history explains that after the court determined that non-party Eric Roth directed document destruction at Canadian defendant company, prompting plaintiff to file a supplemental complaint, the supplemental complaint was dismissed "for lack personal jurisdiction").

Thus, the "two-part test" devised in *Helmac*—which is similar to purposeful availment analysis applicable on personal jurisdiction questions, except that it focuses more on the litigation itself, than the forum—is not applicable here because personal jurisdiction over each of the Sanctioned Parties is proper.  The *Helmac* test certainly should not be read as displacing normal personal jurisdiction analysis for inherent authority sanctions cases, as appellants seem to suggest.

Further, the argument on this score moves beyond merely meritless and into frivolous territory because even if the *Helmac* test were applied, it would still be clear that each of the Sanctioned Parties are subject the district court's inherent sanction authority.

It must be noted that appellants misrepresent the actual "two-part" *Helmac* test itself.  Appellants skip straight to the court's observation about what the "effective limit" of the test will likely be.  Opening Br. at p. 31.  The two-part test itself, however, is whether a non-party (and non-lawyer, one must assume) "(1) [has] a substantial interest in the litigation and (2) substantially participat[ed] in the proceedings in which [the party] interfered."  *Id.* at 568.  The court then made the

observation, which appellants brief mistakes for the rule, that "This test will effectively limit the scope of the Court's inherent power to sanction to those individuals were either (1) parties, (2) subject to a court order, or (3) real parties in interest." *Id.*

The foregoing test is satisfied for all of the same reasons that the district court concluded it had "at least specific jurisdiction" over the Sanctioned Parties. AF Holdings and Ingenuity 13 were parties. All of the Sanctioned Parties were subject to a duly-served court order directing them to appear and show cause why they should not be sanctioned, they all had a substantial interest in the litigation, and they all substantially participated in the proceedings where their sanctionable conduct occurred. Finally, the record also suggests that Steele, Paul Hansmeier, and Duffy were actually the real parties in interest profiting from their shell company "clients".

As noted, Prenda's challenge (Opening Brief, p. 26) to the district court's findings on this last point, that the Prenda Principals are the de facto owners of the plaintiff entities and of Prenda (E.R. 21–22), without refuting or even addressing the parts of the record supporting those findings is probably sanctionable in and of itself. *See* Fed. R. App. P. 28(a)(8)(A); *Sekiya v. Gates* 508 F.3d 1198, 1200 (9th Cir. 2007). Despite being specifically warned about just such an argument (Req. FJN, Exh. 1), the Sanctioned Parties have willfully ignored the following parts of the record, among others, relevant to this challenged finding: (i) Steele's own

representations to the Florida bar that he has an interest in some of Prenda's larger

clients Supp. E.R. 730; (ii) AF Holdings' party admission from its lawyer in Georgia

that Steele has an interest in AF Holdings (Supp. E.R. 744–45), and (iii) the Gibbs'

financials (Supp. E.R. 904–19) showing that Steele, Hansmeier and, to a lesser

extent, Duffy kept substantially all of Prenda's litigation income for 2012, with no

payments out to clients other than a paltry sum to Lightspeed.

> (4)  Given The Sanctioned Parties' Extreme Abuse Of The Judicial Process, And The Quasi-Public Interest Aspect To the Cases Below, It Was Not An Abuse Of Discretion To Award So-Called "Fees On Fees"

In *Chambers*, the Supreme Court stated,

> "the District Court concluded that full attorney's fees were warranted
> due to the frequency and severity of [the sanctioned party's] abuses of
> the judicial system and the resulting need to ensure that such abuses
> were not repeated. Indeed, the court found [the sanctioned party's]
> actions were 'part of [a] sordid scheme of deliberate misuse of the
> judicial process' designed 'to defeat [the opposing party's] claim by
> harassment, repeated and endless delay, mountainous expense and
> waste of financial resources.' 124 F. R. D., at 128. It was within the
> court's discretion to vindicate itself and compensate [the opposing
> party] by requiring [the sanctioned party] to pay for all attorney's fees."
> *Chambers*, 501 U.S. at 56–57; *citing Toledo Scale Co. v. Computing
> Scale Co.*, 261 U. S. 399, 428 (1923).

If one substitutes "plunder[ing] the citizenry" through fraudulent lawsuits, which is

what the court found was the object of the conspiracy here (E.R. 20), for "repeated

and endless delay, mountainous expense and waste of financial resources," then the

foregoing might as well have been written about this case.  If anything, what

occurred here was worse and even more harmful to the administration of justice than

what occurred in *Chambers*.

The Sanctioned Parties rely on *Orange Blossom Ltd. P'ship v. S. Cal. Sunbelt Developers, Inc. (In re S. Cal. Sunbelt Developers, Inc.)*, 608 F.3d 456, 466 (9th Cir. 2010) for the questionable proposition that an Article III court lacks the discretion to award so-called "fees on fees" pursuant to its inherent authority under any circumstances. The *Orange Blossom* court followed *Lockary v. Kayfetz*, 974 F.2d 1166 (9th Cir. 1992), which rejected fees on fees pursuant to the old language of Rule 11. The *Orange Blossom* court both distinguished *Lockary,* concluding it was still good law notwithstanding the 1993 amendments to Rule 11, and followed it, concluding that "the trial court should limit sanctions to the opposing party's more 'direct' costs, that is, the costs of opposing the offending pleading or motion." *Id.* at 466.

The *Orange Blossom* decision has already been rather severely criticized (albeit on slightly different grounds) by at least one bankruptcy court, and there are several good reasons why it should not control here. *See Grine v. Chambers (In re: Grine)*, 439 B.R. 461, 470 (Bankr. N.D. Oh. 2010) (describing the *Orange Blossom* court as having "resorted equally unpersuasively to hyper-technical legal gymnastics to distinguish *Sternberg*[23] in the context of applying § 303(i) of the Bankruptcy Code").

---

[23] *Sternberg v. Johnston*, 595 F.3d 937 (9th Cir. 2009).

- 57 -

Crucially, the *Orange Blossom* court did not address or even mention the Supreme Court's controlling inherent authority sanctions precedent from *Chambers* or *Toledo Scale Co.*

This omission is consistent with a view that *Orange Blossom* is better understood as a case involving fee shifting pursuant to Section 303(i) of the Bankruptcy Code which permits attorney's fees upon dismissal of an involuntary petition, than as an inherent authority sanctions case. In finding the sanctioned parties guilty of "bad faith" the bankruptcy court in *Orange Blossom* was applying standards used in connection with 11 U.S.C. § 303(i)(2) which allows attorneys' fees where a creditor brings an involuntary petition in bad faith.

Second, although the appellate decisions are not entirely clear, the kind of "bad faith" at issue in *Orange Blossom* was mere "delay tactics". *See Orange Blossom Ltd. P'ship v. S. Cal. Sunbelt Developers, Inc.,* C.D. Cal. No. 8:06-cv-0260, ECF No. 10, 8/21/08 (on appeal district court affirmed finding of bad faith given "bankruptcy court's finding that Appellants have generally engaged in delay tactics throughout this litigation").

Simply, in terms of the severity and scope of the bad faith at issue, this case is much closer to *Chambers* than it is to *Orange Blossom*. As in *Chambers*, the district court here was within its discretion to award full fees for this action, even though some of the fees were incurred in connection with post-dismissal sanctions, rather

than litigation on the merits of the underlying claim. While the appropriate case for an award of full attorneys' fees pursuant to a court's inherent authority may be rare, if this is not such a case, then what is?  A firm rule on this Circuit that such an award can *never* be made would arguably contradict the Supreme Court's holdings in both *Chambers* and *Toledo Scale Co.*

Further, the district court should be afforded additional leeway to award ***full*** fees to Doe for sticking in the case to present a detailed mosaic of Prenda's sanctionable activities because doing so took on aspects of public interest litigation. It is worth remembering that Prenda had been at this scheme *for almost two and a half years,* filing hundreds of cases against thousands of defendants, in dozens of federal district courts around the country.  As the district court here recognized, Prenda brought large numbers of nuisance value suits and would simply voluntarily dismiss a given case at the first hint of trouble.  Since Prenda's fraudulent enterprise was a numbers game designed to evade review, it seems likely that if Doe had not invested substantial attorney time in exposing the full scope of what Prenda was doing to an interested court, then Prenda would still be at it.

As the 11th Circuit recently noted, "we have repeatedly stressed that the district court's discretion in imposing non-coercive sanctions is particularly broad and only limited by the requirement that they be compensatory . . . '[W]hen the public interest is involved . . . , [the district court's] equitable powers assume an

even broader and more flexible character.'" *FTC v. Leshin*, 719 F.3d 1227, 1231

(11th Cir. 2013) (internal quotations and additional citations omitted) *quoting AT&T*

*Broadband v. Tech Commc'ns, Inc.*, 381 F.3d 1309, 1316 (11th Cir. 2004).

Similar considerations should inform the Court's decision here given the

serious problems posed, both for the courts and the public, by abusive "troll"-type

litigation.  If a defendant faced with a fraudulent, nuisance-value suit cannot be

assured of being awarded (to say nothing of collecting) his or her full fees and costs

incurred exposing the fraud, what incentive is there to do so?

    (5)    <u>The Fact That The Forged Documents Were Filed Only In The AF Holdings Cases Is A Red Herring Because Other Aspects Of The Sanctioned Parties' Fraud Occurred In The Lead Case Below</u>

The difference between AF Holdings and Ingenuity 13 is that the former took

assignment to copyrights from a former Prenda client (via a forged agreement),

whereas the latter purported to produce its own pornography as a work-for-hire (E.R.

126).  In some respects, the notion of Ingenuity 13, as fully vertically integrated

copyright troll, creating otherwise-valueless porn content that it monetizes only

through infringement litigation, is an even more disturbing perversion of the

Copyright Act.  This cannot be what the framers of the Constitution had in mind

when they empowered Congress to "promote the Progress of Science and useful

Arts" by enacting the Copyright Act.

The Sanctioned Parties note that an assignment need only be signed by the

assignor,[24] and, in view of that consideration,[25] conclude that "the District Court did not indicate what possible motive Appellants would have to intentionally present a forged copyright assignment to the Court." Opening Br. at p. 18, fn.4.

But the district court **did** explain the Sanctioned Parties' motive to deceive. Prenda's "deception was calculated so that the Court would grant Plaintiff's early discovery requests, thereby allowing Plaintiffs to identify defendants and exact settlement proceeds from them." E.R. 23. "[I]f the [Prenda] Principals assigned the copyright to themselves, brought suit in their own names, and disclosed that they the sole financial interest in the suit, a court would scrutinize their conduct from the outset." E.R. 26.

The foregoing applies with equal force to the Ingenuity 13 cases, including the lead case below, where the Prenda Principals declined to disclose anyone with a pecuniary interest in the litigation other than Ingenuity 13 itself. Supp E.R. 1. Thus, the 'forgeries happened in the other case' argument is unavailing.

* * *

In sum, the Sanctioned Parties have failed to carry their burden of showing that the district court abused its discretion by awarding John Doe full compensatory attorneys' fees.

---

[24] *See Effects Associates, Inc. v. Cohen,* 908 F.2d 555, 557 (9th Cir. 1990).

[25] This assumes the Prenda Principals *knew* that nobody need execute a copyright assignment on behalf of an assignee.

**(b)    The "Punitive Multiplier" Part Of The Sanctions Award To John Doe Should Also Be Affirmed Because It Is Akin To Punitive Damages Or It Can Be Justified As A Lodestar Enhancement**

    (1)    <u>The Supreme Court Has Noted That Punitive Damages Advance Interests of Deterrence And Are Properly Awarded In Civil Cases Without Resort to Criminal Due Process Procedures</u>

The Supreme Court has noted that punitive damages are "analogous" to criminal penalties, explaining, "'[P]unitive damages advance the interests of punishment and deterrence, which are also among the interests advanced by the criminal law.'" *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 504-505 (U.S. 2008) *quoting Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 275 (1989) (additional citations omitted).

However, courts routinely adjudicate punitive damage awards in civil cases without resort to criminal procedural protections. *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 417 (2003) (`"[a]lthough these awards serve the same purposes as criminal penalties, defendants subjected to punitive damages in civil cases have not been accorded the protections applicable in a criminal proceeding.").

In *Hanshaw*, 244 F.3d at 1139, this Court expressly agreed with the Second Circuit's reasoning in *Mackler Prods.*, 146 F.3d at 127–28, where it vacated and remanded a $10,000 penalty *payable to the court* because it was punitive. However, the Second Circuit allowed for the imposition of what was ultimately $45,000 in compensatory sanctions in that case even though it had already affirmed the award

to the plaintiff of $69,000 in compensatory damages *plus $69,000 in punitive*

*damages*, neither of which were subject to criminal due process protections.  *See*

*Mackler Prods. v. Turtle Bay Apparel,* 92-cv-5745, 1994 WL 267857.

      (2)    <u>The Supreme Court Also Recognized The Need For A Civil Procedure</u>
               <u>To Deter Wrongful Civil Litigation Conduct By Enacting Rule 11(c)</u>

The advisory committee notes for the 1993 amendment of Rule 11 explain

that "the purpose of Rule 11 sanctions is to deter rather than to compensate."

Advisory Committee Note on Rule 11 (1993 Amendment); *see also Cooter & Gell*

*v.Hartmarx Corp.*, 496 U.S. 384, 393 (1990) ("Although [Rule 11] must be read in

light of concerns that it will spawn satellite litigation and chill vigorous advocacy, []

any interpretation must give effect to the Rule's central goal of deterrence.") *citing*

Advisory Committee Note on Rule 11 (1983 Amendment).

However, even though deterrence is the overall goal of Rule 11, rather than

compensation or coercion, the Ninth Circuit, like other circuits, has "rejected the

necessity of criminal contempt protections in Rule 11 proceedings." *See In re:*

*DeVille*, 361 F.3d 539, 552 (9th Cir. 2004) *citing Eisenberg v. Univ. of New Mexico,*

936 F.2d 1131, 1137 (10th Cir. 1991)*; Donaldson v. Clark,* 819 F.2d 1551, 1558

(11th Cir. 1987).  The only due process required for civil sanctions under Rule 11 is

"notice and an opportunity to respond." *See In re: DeVille*, 361 F.3d at 552 *citing*

*Hudson v. Moore Business Forms, Inc.,* 898 F.2d 684, 686 (9th Cir. 1990).

(3)    Deterrence Was Also A Key Concern In *DeVille* and *Dyer*

The two cases on which Appellants principally rely with respect to the

punitive multiplier, *Miller v. Cardinale* (*In re: DeVille*), 280 B.R. 483 (9th Cir.

B.A.P. 2002), and *Lindblade v. Knupfer* (*In re: Dyer*), 322 F.3d 1178 (9th Cir. 2003)

both further reinforce the idea that ***deterrence*** is an appropriate consideration in

formulating ***civil*** sanctions.

(A)    *DeVille: If Deterrent Penalty Fails As Matter Of Court's*
           *Inherent Authority, It Can Be Sustained Under Bankruptcy*
           *Version Of Rule 11(c), Absent Criminal Due Process Protections*

In *DeVille*, a bankruptcy court found that defendant Miller and his attorney

Smith had acted with subjective bad faith by filing a series of dilatory bankruptcy

notices designed to stall a separate civil lawsuit. *In re: DeVille*, 280 B.R. at 486–91.

In response, the bankruptcy court awarded plaintiff Cardinale not only what it

deemed to be reasonable attorney's fees and costs of $19,929.45, but also an

additional amount of $23,597.  *Id.* at 491.  "The sanction, the [bankruptcy] court

expressly held, was not 'punitive,' but was 'intended to compensate plaintiff ***and to***

***deter Smith and Miller from continuing their pattern of misconduct*.'"  *Id.*

(emphasis added).

On appeal, the bankruptcy appellate panel affirmed the compensatory part of

the sanction award, but viewed the sum in excess of Cardinale's reasonable

compensation as a penalty that could not be sustained as an exercise of the

bankruptcy court's inherent authority. *In re: DeVille*, 280 B.R. at 497-98 *citing*

*Mackler Prods.*, 146 F.3d at 130–31 *and Chambers*, 501 U.S. at 42–51. However,

the bankruptcy court noted that, even absent criminal contempt procedures, the

excess part of the award could potentially be sustained under Bankruptcy Rule

9011(c)(2)[26]. *In re: DeVille*, 280 B.R. at 498. The bankruptcy panel noted that the

additional sanction was an appropriately limited and necessary deterrent, and that

"[i]t is well established that a court may impose a sum that is appropriate for

deterrence purposes, even if it exceeds the amount of the fees incurred by the

opposing party." *Id. citing Frantz v. U.S. Powerlifting Fed'n*, 836 F.2d 1063, 1066

(7th Cir. 1987). The bankruptcy panel further explained,

> "The additional sanction was not excessive, . . . the sanction was appropriate to deter Appellants' scheme to circumvent court orders, deprive the proper division of the bankruptcy court of its jurisdiction, and abuse the bankruptcy process, all for the wrongful purpose of impeding a state court action and harassing a plaintiff.
> But for one blemish, the "penalty" would be eligible to be affirmed. The blemish is that the Rule 9011(c)(2) "penalty" must be paid "into court." Here, the penalty was ordered paid to Cardinale and thus cannot stand as a Rule 9011(c)(2) penalty.
> Hence, although Appellants richly deserve the sanctions awarded against them for their bad faith course of conduct, we are obliged to reverse that portion of the sanctions that constituted a penalty, and remand it for the bankruptcy court's further consideration."

*In re: DeVille*, 280 B.R. at 498.

Miller and Smith then appealed again, to the Ninth Circuit. *In re: DeVille*, 361

---

[26] This rule is a materially identical parallel of Fed. R. Civ. P. 11.

F.3d 539 (9th Cir. 2004). They argued, *inter alia*, that a deterrent penalty could not be revived per Bankruptcy Rule 9011, because they had not been afforded criminal contempt due process protections. *Id.* at 548, 551–53. The Ninth Circuit affirmed the judgment of the bankruptcy appellate panel, finding that Rule 9011 was the correct basis for imposition of a deterrent sanction.

However, the Ninth Circuit in *DeVille* also noted a distinction between a sanction that is "punitive" and one that "aimed at deterrence." *Id.* at 553, fn. 9. Smith and Miller had urged court to follow *Mackler Prods.* *Id.* However, the Ninth Circuit distinguished *Mackler Prods.*, explaining,

> "The procedural protections required by Mackler, in an inherent power setting, turned on what the Second Circuit perceived to be the criminal character of the sanction at issue — ***a sanction characterized by the district court as "punitive," not as a sanction aimed at deterrence***. Id. As detailed above, the Rule 9011(c)(2) sanctions levied in this case were aimed at deterrence, not punishment."

*Id.* (emphasis added).

In short, in *DeVille,* the bankruptcy appellate panel read *Mackler Prods.* and *Chambers* as suggesting that deterrent penalties are not allowed as a matter of the court's inherent authority, absent observance of criminal due process protections. However, although the Ninth Circuit affirmed the result, and it agreed that the case should be remanded so a deterrent sanction could be imposed per the bankruptcy

version of Rule 11, it also noted a distinction between "deterrent" and "punitive" sanctions.

       (B)   *Dyer: There Is Potential Tension Between Rule For Punitive Damages And Rule For Contempt Penalties, And Court's Inherent Sanction Power Should Provide For Deterrence*

In *Lindblade v. Knupfer* (*In re: Dyer*), 322 F.3d 1178 (9th Cir. 2003) a bankruptcy court ordered that a creditor, Lindblade, pay the trustee attorney's fees, plus $50,000 as a "punitive sanction," for violating the automatic bankruptcy stay (11 U.S.C. § 362), by recording a deed of trust, post-petition. *Id.* at 1182–85. Lindblade appealed the bankruptcy court's order sanctioning him to the district court, which concluded that some of the attorney's fees were not warranted, because they were unrelated to the stay violation, and that punitive damages were not warranted on the facts presented. *Id.* at 1185–86. The trustee then appealed, arguing "that the entire award can be sustained as punitive sanctions," (*id.* at 1192) but the bankruptcy panel "conclude[d] that significant punitive sanctions are not available under either the civil contempt authority of 11 U.S.C. § 105(a) or the bankruptcy court's inherent sanction authority." *Id.* at 1182.

Noting a more particular subtype of the general conflict between the civil standard for awarding punitive damages and the heightened standard for imposing criminal contempt penalties, the court explained,

        "The proposition that due process prevents a bankruptcy court from imposing serious punitive sanctions under the contempt authority of §

> 105(a) for an automatic stay violation has been portrayed as being in some tension with the bankruptcy court's authority to impose punitive damages under § 362(h). *See Cox v. Delaware, Inc.*, 239 F.3d 910, 916 (7th Cir.2001) (so stating). We do not see any such tension as pertinent for present purposes. Regardless of the bankruptcy court's ability to award punitive damages under express statutory authorization such as § 362(h), we conclude that additional procedural protections are required where, as here, a court utilizes its broad contempt powers to vindicate its own authority."

*In re: Dyer*, 322 F.3d at 1194.  The court then went on to address the difference between a bankruptcy court's civil contempt power under Section 105(a) of the Bankruptcy Code, and its inherent authority to sanction,

> Civil contempt authority allows a court to remedy a violation of a specific order (including "automatic" orders, such as the automatic stay or discharge injunction). ***The inherent sanction authority allows a bankruptcy court to deter*** and provide compensation for a broad range of improper litigation tactics. *Fink v. Gomez*, 239 F.3d 989, 992-93 (9th Cir. 2001)." (emphasis added).

*In re: Dyer*, 322 F.3d at 1196.  The bankruptcy panel also noted that inherent authority sanctions differ from civil contempt authority because the former requires an explicit finding of bad faith or "willful misconduct," a term with a distinct meaning in the sanctions context.  *Id.*

Referring approvingly to the bankruptcy appellate panel's ruling in *In re: DeVille*, and citing *Hanshaw*, the Ninth Circuit thus concluded,

> "Addressing the issue of punitive inherent authority sanctions as one of first impression, we conclude that the same reasons underlying our holding that the bankruptcy court lacks the authority to impose serious punitive sanctions under its contempt authority indicate the answer to

> the parallel question concerning the inherent sanction authority. . . . Therefore, even if the bankruptcy court properly resorted to its inherent authority to sanction Mr. Lindblade, the punitive portion of the award could not be sustained under that authority."

*In re: Dyer*, 322 F.3d at 1197.

In short, in *Dyer*, the Ninth Circuit held that a punitive sanction award cannot be sustained as a matter of a bankruptcy court's inherent authority absent criminal due process protections, but it also assumed that a court's inherent sanction authority included the ability to deter wrongful conduct.

    (4)    <u>Here, The Punitive Multiplier Should Be Sustained In Order To Appropriately Deter Appellants And Other Similarly Situated Copyright Litigants From Abusing The Federal Court System</u>

As explained above, deterrence is a key part of most forms of civil sanctions, including punitive damages, and Rule 11 sanctions, which are both assessed pursuant to purely civil procedures. The *Dyer* court went so far as to state that "the inherent sanction authority allows a bankruptcy court to deter and provide compensation for a broad range of improper litigation tactics." The *Dyer* court cited to *Fink* for that proposition, but *Fink* does not actually mention anything about deterrence. The *Dyer* court was right though, even if its proposition about a twin rationale for inherent authority sanctions is only halfway supported. As with other forms of civil sanctions, deterrence ***should*** play an important role in calculating an appropriate civil sanction pursuant to the court's inherent authority. The Ninth Circuit in *DeVille* appeared to be getting at the same point when it distinguished the

"punitive" sanction at issue in *Mackler Prods.* from a sanction "aimed at deterrence."

Certainly, the Supreme Court has never held that *civil sanctions* issued pursuant to a court's inherent authority are strictly limited to the compensatory and the coercive, and cannot include assessment of an amount sufficient to deter. Although there is more than one case on this Circuit essentially following the Second Circuit's approach from *Mackler Prods.*, it is notable that almost every court considering these issues has noted the deterrent aspect of civil sanctions.

There is a peculiar irony to the *Mackler Prods.* approach to civil inherent authority sanctions brought into sharp relief by the circumstances of this case. Assume, as often appears to be true in relevant appellate decisions, that a court wishes to rein in wrongful conduct that disrupts the administration of civil litigation, without resort to a side adventure into empanelling a jury and appointing a special prosecutor, etc. In other words, assume that a court intends to afford merely standard civil due process, meaning notice and an opportunity to be heard. Under such circumstances, a court may impose a large deterrent sanction (if necessary) over and above compensatory damages, under Rule 11, even absent bad faith. However, if Rule 11 sanctions are unavailable due to some kind of technicality, like the status of the bad actor, then even if there is bad faith of the worst possible kind,

current circuit precedent suggests that a court lacks the inherent authority to issue a deterrent sanction over and above compensatory damages.

Here, the technicality prohibiting imposition of a deterrent sanction per Rule 11 is that the Sanctioned Parties—part and parcel to their bad faith national litigation strategy of attempting to avoid scrutiny—voluntarily dismissed their case before the court issued its OSC re: Sanctions.  *See* Fed. R. Civ. P. 11(c)(5)(B).  One might suggest that John Doe might perhaps have considered filing an answer to keep Prenda from escaping so easily, which would have preserved the district court's authority to issue an OSC per Rule 11. *See id.*; Fed. R. Civ. P. 41(a)(1)(A)(i). However, beyond the original complaint against "John Doe" who was "known to Plaintiff only by an Internet Protocol address (IP address)" (E.R. 114, ¶ 4), Prenda never went so far as to specifically allege that appellee *was the defendant*.  Appellee (who paid the Internet bill for an account allegedly linked to infringing activity) was also never formally served with any complaint.  No doubt, if appellee had filed an answer, or a Rule 11 motion, Prenda would have objected since appellee was technically not yet alleged to be the defendant.  *See* ECF No. 108, p. 6 (Duffy and Prenda's OSC response brief arguing that defense counsel "represents no party with an interest in the proceedings"). Exploiting this Rule 11(b) gray area about the exact status of Internet users identified ISP by subpoena in 'John Doe IP address' lawsuits was a crucial plank in Prenda's national platform of abusive litigation.

It seems strange and unsupportable that the limit of an Article III court's authority to use civil procedures to combat hastily-dismissed fraudulent civil lawsuits with a deterrent sanction should depend on whether or not the aggrieved opposing party happens to have filed *a motion* for sanctions before the court issues an OSC re: Sanctions. What if, as here, there is no defendant who has appeared as such in the case? Should the court really not have the inherent authority to issue a deterrent sanction, using civil procedures, so as to summarily put a stop to such conduct? The *DeVille* court's preferred approach, of sending the case back down for a deterrent sanction to be imposed pursuant to Rule 11 instead of the court's inherent authority, only works here if John Doe is allowed to file such a motion on remand (which John Doe would certainly do). In any event, such an approach seems to needlessly elevate procedure over substance, and it provides fertile ground for appeals by bad faith litigants resulting in further satellite litigation. Indeed, *Mackler Prods.*, the guiding light on this point of law, went up and down on appeal several times.

As the *Mackler Prods.* court itself noted, "The court's power to impose appropriate sanctions on attorneys practicing before it 'springs from a different source than does the power to punish for criminal contempt.'" *Mackler Prods.*, 146 F.3d at 129 *citing Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193, 1209 (11th Cir.1985). "The risk of vindictive pursuit by an offended judge" (*Mackler*

*Prods.*, 146 F.3d at 129) is greater in the contempt context, where a Judge creates the rule that is violated, than in a sanctions case where a litigant typically runs afoul of more basic norms.  Further, contempt can be a crime, punishable by prison, neither of which are true of sanctions.  *Id.*

This Court is respectfully requested to distinguish *Mackler Prods*. again, as the Ninth Circuit did in *In re: DeVille*, 361 F.3d at 553, fn. 9, and hold that when Rule 11 sanctions are unavailable, a court may rely on its inherent authority to impose a necessary deterrent sanction using *civil* procedures.

The "punitive multiplier" here is not the kind of "flat, unconditional" penalty that *Bagwell* and its progeny (such as *Mackler Prods.*) are rightly concerned with limiting in the contempt context.  The court here did not supply the rule that was violated, and this is not a case, like *Bagwell*, where the court could arguably be perceived as off on a witch hunt to pursue contempt on its own, even though the aggrieved party had no interest in doing so (which is also the only conceivable rationale for Fed. R. Civ. P. 11(c)(5)(B)).  Thus, some of the reasons for why the *Bagwell* and *Mackler Prods.* courts sought to cabin a court's inherent authority to issue monetary sanctions pursuant civil due process procedures simply do not pertain in this case.

At bottom, given the totality of the Sanctions Order, the "sanctions levied in this case were aimed at deterrence, not punishment." *In re: DeVille*, 361 F.3d at 553,

fn. 9.  To be sure, the fact that the district court uses the term "punitive multiplier" and that the court considered, but rejected a 7-figure deterrent sanction, implies an aspect of punishment.  But this Court is "not bound by the mere label the district court gave its" sanction award.  *Hanshaw,* 244 F.3d at 1143; *citing Primus,* 115 F.3d at 648.  On the record presented, this Court should find that doubling of the fee award here was necessary to "deter repetition of the conduct or comparable conduct by others similarly situated."  *Cf.*  Fed. R. Civ. P 11(c)(4).  Rather than remand for further findings to that effect, the Court should simply affirm the award as a matter of inherent authority, because in this case Rule 11 was not quite up to the task, but a deterrent sanction is clearly called for.

If awarding double fees to a litigant who uncovers a nationwide fraudulent civil litigation scheme is considered necessary for deterrence purposes, and Rule 11 is unavailable (for reasons which may or may not be curable on remand), then there really is no good reason to require criminal procedural protections prior to the imposition of an appropriate deterrent sanction.  "Necessity," is, after all, "the traditional justification for the relative breadth" of a court's inherent authority.  *See Bagwell*, 512 U.S. at 831.

Finally, Doe would further submit that it is *in just such a case as this* where there is an ongoing fraud that is hard to detect, that the need for appropriate deterrence is at its greatest.  *Cf. Perez v. Z Frank Oldsmobile, Inc.*, 223 F.3d 617

(7th Cir. 2000) (Easterbrook, J.) (punitive damage case reviewing Nobel Prize literature on optimal deterrence and stating "Frauds often escape detection, and the need to augment deterrence of concealable offenses is a principal justification of punitive damages.") *quoting* Polinsky, M. & Shavell, S., *Punitive Damages: An Economic Analysis,* 111 Harv. L. Rev. 869 (1998). Given the irresistible lure of copyright statutory damages combined with industrial-scale BitTorrent litigation, it is probably only a matter of time before a district court on this Circuit is faced with some new version of a similar scheme to Prenda's.

    (5)    <u>The Multiplier Should Also Be Affirmed, Or Remanded For Further Findings, On The Theory That It Was An Enhancement Of The Attorneys' Fees Lodestar, Which Does Not Require Criminal Due Process Protections</u>

Upward adjustments of the attorneys' fee lodestar have been affirmed by the Ninth Circuit. *Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 100 F.3d 691, 697-699 (9th Cir. 1996) (affirming 2.0 multiplier); *Fadhl v. City and County of San Francisco*, 859 F.2d 649, 651 (9th Cir. 1988) (affirming district court's choice of 2.0 multiplier despite its reliance on impermissible factors where the permissible factors alone amply supported the result).  Such fee enhancements obviously do not require observance of criminal due process.  Although this was not the stated rationale for the 2.0 multiplier applied in this case, this Court could affirm, or remand for further findings, on that theory. *New Kids on the Block*, 971 F.2d at 305.

In particular, Doe would submit that of the 11 so-called *Hensley* factors (*see Van Gerwen v. Guarantee Mut. Life*, 214 F.3d 1041 (9th Cir. 2000)), the following factors each militate in favor of upwards adjustment:

8) <u>The experience, reputation and ability of the attorneys</u>. The particularized experience of defense counsel was one of the key reasons Prenda's 2.5+ year scheme finally came unraveled.  Defense counsel was very familiar with Prenda's operations and this type of litigation generally, and was therefore able to assemble into a mosaic various documents and other evidence from Prenda actions pending all over the country.  This case involved various facts coming from: Florida; Chicago; St. Clair County; Illinois; San Francisco; Nebraska; Massachusetts; Las Vegas; Georgia; Minnesota; Pennsylvania; and Washington, DC, among other places.  The reason Doe was able to piece the puzzle together for the court here was that defense counsel knew where the various clues were hidden.

3) <u>The skill requisite to perform the legal service properly</u>. As noted, the skill that made a difference here was knowing where to find the facts.

2) <u>The novelty and difficulty of the issues</u>.  These cases present a number of novel issues.  For example, the district court's examination of the relation of Rule 11(b) pleading standards to cases involving pre-service ISP subpoenas is, as far as undersigned counsel is aware, the first court anywhere to look

at that issue in detail. It is a novel and difficult issue on which much of the copyright trolling business model depends.

7) <u>The amount involved and the results obtained</u>.  The Prenda copyright trolling operation, which sued almost 20,000 people over 2.5+ years, in hundreds of cases spread across dozens of federal district courts, extracting millions of dollars in dubious "settlements," is now effectively out of business (at least for the time being).  That is due in no small measure to the results obtained in the lead case below.  While the amount invested (and hopefully returned with dividends) by Doe in the form of attorneys fees is relatively small, the millions of abusive settlements hopefully avoided by others in the future is a much larger sum.

(6) <u>If Remanded, The District Court Should Also Consider Imposition Of A Deterrent Sanction Per Rule 11(c), Additional Reasonable Fees And Costs, And Imposition Of A "Non-Serious" Penalty</u>

If the court determines that any part of the fee award must be vacated, then the case should be remanded for the district court to consider the following issues:

Doe should be allowed to bring a Rule 11 motion to put deterrent sanctions back in play. The record reflects that John Doe already intended to bring a motion for sanctions and had begun meet and confer attempts on that issue when the district court issued an OSC re: sanctions. Supp. E.R. 327–28. Further, although the district court suggested that it did not then have enough facts before it to justify "a seven-digit sanction adequate to deter Plaintiff's from continuing their enterprise," (E.R.

27) the Gibbs financials submitted with his motion for indicative ruling below may change that.  Similarly, developments in other Prenda cases (e.g., the voicemails where John Steele called GoDaddy and impersonated Alan Cooper, computer evidence suggesting Prenda was seeding its movies onto BitTorrent in the first place, as well as more in depth discovery on Prenda's financials) may give the district court the facts it needs to issue the kind of deterrent sanction it had in mind.  Such an approach would be consistent with *In re: DeVille*, 280 B.R. at 498.

The district court should consider attorneys' fees and costs incurred by Doe subsequent to the court's May 6, 2013 Sanctions Order.  There was quite a bit of activity in this action after that time, much of it occasioned by Prenda's continuing bad faith. *See* Section III(g), *supra*.

The district court should also consider whether it can impose, without resort to criminal procedure, the maximum possible "non-serious" penalty, which this court's precedent suggests may be around $7,500 when adjusted for inflation. *See Knupfer v. Lindblade (In re Dyer)*, 322 F.3d 1178, 1193 & n.16 (9th Cir. 2003) citing, *inter alia*, *Mark Indus., Sea Captain's Choice, Inc.,* 50 F.3d 730, 733 (9th Cir. 1995) (stating that appropriate award of non-compensatory damages under district court's inherent authority would be "at most, $5,000," at least in 1995 dollars).

Finally, if remanded, Prenda has asserted no valid reason to reassign the case. Indeed, Ingenuity 13's motion for recusal was denied by Judge Fitzgerald.

**(c)     Since Being Sanctioned, Prenda And Its Lawyers Have Continued To Litigate In Bad Faith, Thus Justifying The Court's Exercise Of Discretion In Requiring A Higher Bond And Imposing Various Conditions**

(1)     Standard Of Review For Amount And Conditions On Appellate Bonds Is Abuse Of Discretion

As previously noted by the motions panel in this case, the court reviews objections to amount of bond on appeal for abuse of discretion. *Azizian v. Federated Dep't Stores, Inc.*, 499 F.3d 950, 955 (9th Cir. 2007).

(2)     In View Of Prenda's Continued Bad Faith Regarding The Bond Issue, The District Court Was Within Its Discretion To Impose The Conditions Requested By John Doe

In Doe's estimation, this litigation did result in a "material alteration of the legal relationship of the parties,"[27] in that appellants were roundly sanctioned and referred for criminal prosecution based on their conduct in bringing vexatious lawsuits. Accordingly, prevailing party attorney's fees under the Copyright Act, which count as part of "costs" on appeal in copyright cases, should be available to Doe.  Given the challenges and potential for abuse posed by the increasingly pervasive "copyright troll" business model, this Court would be well-justified in tipping the pendulum on this issue back towards its prior precedent in *Corcoran*.[28]

---

[27] *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.,* 532 U.S. 598, 604 (2001).

[28] *Corcoran v. Columbia Broadcasting System, Inc.,* 121 F.2d 575, 576 (9th Cir.1941) (holding that a defendant in a copyright suit was a prevailing party and was entitled to attorney's fees when the plaintiff voluntarily dismissed the complaint without prejudice after the district court granted defendant's motion for more

Such an approach would be consistent with the overall goal of the Copyright Act as an incentive to prevent overreach by copyright rights holders.

However, the district court's bond order is also supportable purely as an exercise of discretion, given appellants' bad faith responses to attempts to meet and confer on the amount and conditions of the bond. *See Azizian*, 499 F.3d at 955; Supp. E.R. 838–41 (bad faith emails re: bond); Section III(g) supra.

/ /

definite statement) *overruled by Cadkin v. Loose*, 569 F.3d 1142, 1144–45 (9th Cir. 2009) (concluding that *Corcoran, supra,* was irreconcilable with *Buckhannon, supra*).

## VI.  CONCLUSION

As one commentator noted generally in the early days of file sharing infringement cases, such cases "weaken intellectual property norms by undermining the social, moral and legal legitimacy of intellectual property law." Opderbeck, D., "Peer-to-Peer Networks, Technological Evolution, and Intellectual Property Reverse Private Attorney General Litigation," 20 Berkeley Tech. L.J. 1685 (2005).  The whole "copyright troll" business model is dubious at best.

Here, however, the Prenda Principals crossed the Rubicon in these cases by resorting to fraud, which included identity theft, creating sham offshore shell companies, forging documents and repeatedly lying to the court.  Rare is the case where plaintiff's lawyers plead the fifth rather than answer a court's questions, which should be routine, about who owns the clients and how the litigation is being conducted.

The Sanctioned Parties have failed to meet their burden of showing that the district court abused its discretion in finding them to be engaged in a fraudulent scheme, and in assessing an appropriate sanctions, which both compensates Doe, and hopefully will deter other similarly situated litigants.  Accordingly, appellee John Doe respectfully requests that the sanction and bond orders of the district court be affirmed. In the alternative, the case should be remanded for further findings so as to keep the Sanctioned Parties from dodging liability for their egregious conduct.

Respectfully submitted,

DATED: January 17, 2014            THE PIETZ LAW FIRM


*/s/ Morgan E. Pietz*
Morgan E. Pietz

*Attorney for Defendant-Appellee,*
*John Doe*

## STATEMENT OF RELATED CASES

Appeal No. 13-80114, which concerns Paul Hansmeier's application for admission to the bar of the Ninth Circuit Court of Appeals, is listed on the docket as a related case to these consolidated appeals, but is not identified in appellants' statement of related cases.

## <u>CERTIFICATE OF COMPLIANCE</u>

### Certificate of Compliance Pursuant to 9th Circuit Rules 32-2
### (As Adapted From Form 8)

I certify that this brief is accompanied by a motion for leave to file an oversize brief pursuant to Circuit Rule 32-2 and is: 17,812 words, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This word count was prepared using Microsoft Word.  This brief is in Times New Roman 14-point type.

Respectfully submitted,

DATED: January 17, 2014                THE PIETZ LAW FIRM


                                       */s/ Morgan E. Pietz*
                                       Morgan E. Pietz


                                       *Attorney for Defendant-Appellee,*
                                       *John Doe*

Lead Appeal No. 13-55859

Consolidated Case Nos.:
13-55880; 13-55881; 13-55882; 13-55883; 13-55884; 13-56028

*******************************************************************
## <u>CERTIFICATE OF SERVICE</u>

When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing John Doe's Answering Brief on the Merits with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on

<u>January 17, 2014</u>

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

<u>/s/ Morgan E. Pietz</u>

Morgan E. Pietz
*Attorney for Defendant-Appellee,*
*John Doe*

*******************************************************************